CONNON WOOD LLP
NICHOLAS P. CONNON, State Bar No. 150815
nconnon@connonwood.com
ROBERT A. de By, *Pro Hac Vice* application pending
rdeby@connonwood.com
35 East Union Street, Suite C
Pasadena, California 91103
Telephone:     (626) 638-1750
Facsimile:     (626) 792-9304
Attorneys for Aldini AG

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

| | |
|---|---|
| ALDINI AG,<br><br>              Plaintiff,<br><br>       vs.<br><br>SILVACO, INC., SILVACO FRANCE, MBDA INC., MBDA FRANCE SAS, SOITEC USA HOLDING INC., SOITEC USA, LLC, SOITEC S.A., THE REPUBLIC OF FRANCE, MINISTÈRE DES ARMÉES, DIRECTION GÉNÉRALE DE L'ARMEMENT DGA, STÉPHANE KAMMERER, DOLPHIN INTEGRATION S.A., DOLPHIN DESIGN SAS, ANTOINE BOUVIER, HENRI BERGER, JOSÉ BERIOT, HAROLD VAN DEN BOSSCHE, MICHEL DEPEYROT, CHRISTIAN DUPONT, THIERRY SOMMELET, PAUL BOUDRE, ILIYA PESIC, BABAK TAHERI, AND JOHN/JANE DOES 1-25,<br><br>              Defendants. | CASE NO.  5:21-cv-6423<br><br>**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**<br><br>TRIAL DATE: None Set |

**<u>COMPLAINT</u>**

**<u>Nature of Action</u>**

1.     This is an action for tortious interference with a prospective economic advantage, taking and expropriation in violation of international law, willful tortious conduct under Cal. Civ Code §1714, violations of the Defend Trade Secrets Act, violations of law protecting corporate and business secrets, and aiding and abetting, and mismanagement torts brought against Defendants Silvaco, Inc. ("Silvaco"), MBDA Inc., MBDA France SAS ("MBDA") Soitec USA Holding Inc., Soitec USA, LLC (collectively "Soitec USA"), Soitec S.A. ("Soitec"), Antoine

1  Bouvier ("Bouvier"), José Beriot ("Beriot"), Harold Van den Bossche ("Van den Bossche"), the

2  Republic of France, the Ministère des Armées, the Direction Générale de L'Armement DGA, and

3  the other Defendants because they purposefully drove Dolphin Integration S.A. ("Dolphin

4  Integration") into bankruptcy, perpetrated a fraud on the bankruptcy court, and stripped that

5  company of its assets and intellectual property ("IP") via a secret 'pre-pack' take-over proceeding

6  for a mere €200,004 (approximately $235,000).

7          2.      Dolphin Integration developed, engineered, and produced FD-SOI (*i.e.*, Fully

8  Depleted Silicon On Insulator) micro-chip (System-on-Chip, "SoC") technology and solutions to

9  cope with the constraints of low energy consumption, reliability, and costs encountered in a

10  growing number of consumer and defense applications.  Dolphin Integration's unique products

11  (including its intellectual property and design tools) improve energy performance of very low

12  power integrated circuits and are critical in FD-SOI technology, micro-chip development, and

13  circuit design.

14          3.      Defendants MBDA Inc. and MBDA design, manufacture, market, and sell missiles

15  and missile systems for military use.  MBDA is a major player in and pilar of the French defense

16  industry.

17          4.      Defendant Silvaco is a provider of EDA (*i.e.*, Electronic Design Automation) tools

18  and semiconductor IP, used to develop semiconductor products.

19          5.      Defendants Soitec USA and Soitec manufacture, market, and sell semiconductor

20  materials used to manufacture micro-chips that go into smart phones, tablets, computers, IT

21  servers and data centers, as well as electronic components in cars, connected devices, and

22  industrial and medical equipment.

23          6.      MBDA regularly faced resistance from the United States when selling MBDA's

24  missiles and missile systems to foreign governments.

25          7.      Taking control of Dolphin Integration's technology was crucial in enabling

26  MBDA to evade the United States' ITAR-based objections to MBDA's international arms sales

27  by replacing U.S.-manufactured components in MBDA's missiles with French technology.

28

8.     On information and belief, the Defendants initially tried to acquire Dolphin Integration legitimately, but their efforts failed because its founder Michel Depeyrot did not cooperate and did not wish to step aside as the company's president.  Thus, leaving the company vulnerable to being sold to someone else, possibly a foreign non-French buyer, if the conditions and the price were right.

9.     MBDA later admitted publicly that it stripped Dolphin Integration of its assets and IP in cooperation with Defendant Direction Générale de l'Armement DGA ("DGA"), an agency of Defendant the Republic of France, responsible for assisting the French arms industry with its exports.

10.    On information and belief, Defendants Ministère des Armées (the French Department of Defense), DGA, and the Republic of France instigated, approved, coordinated, participated in, and assisted MBDA and Soitec's plan to drive Dolphin Integration into bankruptcy and to strip it of its assets and IP in order to ensure that the defense-related technology would not fall into foreign, non-French hands and to safeguard and bullet-proof MBDA's international arms sales against objections by the United States based on its ITAR regulations – *e.g.*, the International Traffic in Arms Regulations, 22 C.F.R. 120-130.

11.    On information and belief, multiple levels of the French government were actively engaged during late 2017 and January-August 2018 in the scheme to drive Dolphin Integration into bankruptcy and for MBDA to seize its defense assets and IP, including: the Office of the Prime Minister (a/k/a "Matignon"), the Ministère de l'Économie des Finances et de la Relance (the French Treasury Department, a/k/a "Bercy"), the Ministère des Armées, and the DGA

12.    On information and belief, Ministère des Armées and DGA involved Soitec in their scheme because Soitec plays a prominent role in the Republic of France's efforts to move towards achieving independence from American and Chinese manufacturing in semiconductors and microprocessors.

13.    On information and belief, Dolphin Integration's non-defense assets and IP enable Soitec to gain access to the U.S. microprocessor and semiconductor market through its joint venture with Silvaco in California.

COMPLAINT FOR DAMAGES

14.     On information and belief, Silvaco's, Soitec USA's, and Soitec's motive to participate in MBDA's and the Republic of France's, Ministère des Armées', and DGA's scheme to bankrupt and asset strip Dolphin Integration was commercial.  Silvaco, Soitec USA, and Soitec lent their cooperation and joined the conspiracy in exchange for being given a significant share of the stripped non-defense assets for the Silvaco/Soitec USA/Soitec joint venture in California.

15.     On information and belief, Soitec plays a prominent role in promoting "tech sovereignty" in which French technology is no longer dependent on the United States or China. On July 21, 2021, Soitec hosted Mr. Thierry Breton, the French European Commissioner for Internal Market during a meeting of the European Industrial Chip Alliance, and who is leading efforts create a market-leading European semiconductor giant.

16.     On information and belief, MBDA Inc., MBDA, Silvaco, Soitec USA, Soitec, Ministère des Armées, DGA, and the Republic of France planned and coordinated their efforts, and conspired to carry out their common plan to drive Dolphin Integration into bankruptcy and liquidation to abscond with its assets and IP with the purpose to (i) keep them from falling into non-French hands and to evade the United States' ITAR-based objections to MBDA's foreign arms sales and exports, and (ii) to transfer the non-defense related assets to California where they would form the basis of the Silvaco/Soitec USA/ Soitec joint venture and gain Soitec access to the U.S. semiconductor and micro-chip market.

17.     Defendant Bouvier was MBDA's president at the time.

18.     On information and belief, Bouvier's leading role in the Defendants' conspiracy to drive Dolphin Integration into bankruptcy and strip it of its assets and IP to prevent it from falling into non-French hands and, thus, to '*de-ITAR-ize*' MBDA's products, was a high-level proofing ground of sorts for Bouvier, and it gained him significant political, financial, and career advancement, providing ample personal motive.

19.     Subsequently, on June 1, 2019, Bouvier was promoted and became the Head of Strategy, Mergers & Acquisitions at Airbus, co-owner of MBDA and holding a 37.5% equity share in the company.

20. In January 2020, Airbus reached an agreement with the U.S. Department of Justice to pay more than $3.9 billion in global penalties to resolve a foreign bribery and ITAR case, with United States accepting $527 million for the FCPA and ITAR violations, and an additional approximately $55 million as part of a civil forfeiture agreement for the ITAR-related conduct.

21. On information and belief, Defendants MBDA, Bouvier, Soitec, Ministère des Armées, DGA, and the Republic of France conspired and planned and executed their common scheme, including in California, in coordination with the Defendants located here in California, Silvaco, Pesic, Taheri, Soitec USA, MBDA Inc.

22. On information and belief, as part of the Defendants' plan, MBDA and Soitec infiltrated Dophin Integration's board of directors, and MBDA's and Soitec's employees took their board seats functioning as a Trojan Horse, feeding confidential information and trade secrets back to their employers and, indirectly to the Republic of France, Ministère des Armées, and DGA.

23. Shortly afterward Dolphin Integration's financial issues mysteriously ballooned precipitating its bankruptcy, while, on information and belief, the board deliberately failed to act despite having been mandated to raise capital and financing.

24. On information and belief, using the manufactured financial crisis, and as part of the Defendants' plan, MBDA/Soitec then instigated a secret 'pre-pack'-bankruptcy proceeding, during which MBDA/Soitec and Dolphin Integration's board pretended there was no time to find a better financial solution for Dolphin Integration and MBDA/Soitec pretended to be the 'sole buyer' available, purporting to ensure the continuation of Dolphin Integration and its employees as a going concern.

25. Thus, on information and belief, MBDA and Soitec persuaded the bankruptcy court on false pretenses to permit the sale of Dolphin Integration's business, assets, and IP in a secret pre-pack proceeding rather than the usual public tender and bankruptcy sale. While, in fact, the MBDA and Soitec defendants and their co-conspirators set out to destroy Dolphin Integration and to take the assets for themselves to avoid others from gaining access to the Dolphin Integration assets and IP.

26.     To do so, on information and belief, MBDA, Soitec, and Silvaco perpetrated a fraud on the bankruptcy court to avoid the assets and IP becoming part of a public bankruptcy tender and sale.

27.     On information and belief, Ministère des Armées, DGA, the Republic of France, and MBDA enlisted Soitec to make the pre-pack offer credible because Dolphin Integration's business was largely consumer oriented, as was the Soitec defendants' business, and because it would help Soitec/Soitec USA to expand France's footprint and influence in the semiconductor and microprocessor technology industry in Silicon Valley, a product for which there are significant world-wide shortages and competition.

28.     On information and belief, Silvaco and its executives Pesic and Taheri were an integral part of the fraudulent scheme and Silvaco acquired a significant part of Dolphin Integration's non-defense related assets and IP for its joint venture with Soitec USA/Soitec in California.

29.     On information and belief, Silvaco participated in the pre-pack acquisition scheme and the fraud perpetrated on the bankruptcy court by colluding with MBDA and Soitec in a secret agreement not to reveal its interest in the assets and IP, to make believe that there was no interest, and that there were no other potential bidders thus keeping down the price and avoiding the court ordering a public tender and bankruptcy sale.

30.     On information and belief, Silvaco's silence and subterfuge enabled MBDA and Soitec to pretend to the bankruptcy court that they would continue Dolphin Integration as a going concern to save local employment, while in fact they controlled and suppressed the price being offered for the assets and IP and intended to destroy Dolphin Integration.

31.     After MBDA, Soitec, and Silvaco carried out their scheme to drive Dolphin Integration into bankruptcy and take-over its asset and IP, Defendant Bouvier, MBDA's President at the time, publicly admitted on or about March 19, 2019, that MBDA's "objective is to avoid the takeover of this business by potentially non-European, hostile players" and divulged that MBDA's gaining control of "this kind of highly technological skillset is not only a factor of French sovereignty, but of European sovereignty."

1    32.    On or about March 27, 2019, Defendant Bouvier publicly admitted the

2  involvement and complicity in this illegal commercial operation, and the destruction of Dolphin

3  Integration, by the DGA, the Republic of France, the Soitec defendants, and Silvaco, when he

4  declared that MBDA had acquired Dolphin Integration's assets and IP: "to avoid the resumption

5  of this activity by potentially hostile non-European actors.  So, we acted quickly, we acted with

6  partners, we have acted with the DGA.  Beyond the amount, it is the capacity to be a responsible

7  actor and when there is a sector of sovereignty which is a sector at risk, well, one takes actions

8  and one organizes oneself so that this risk is limited."

9    33.    "DGA", as used by Bouvier, is the abbreviation for Defendant Direction Générale

10  de l'Armement (*i.e.*, General Directorate for Armament), the French government's defense

11  procurement agency responsible for the program management, development, and purchase of

12  weapon systems for the French military, and which coordinates armament projects with the

13  defense industry in France and with customers abroad to promote French arms exports.

14    34.    Defendants Bouvier and MBDA later tried to justify the secret take-over 'pre-

15  pack' scheme, and on information and belief, the fraud perpetrated on the bankruptcy court by

16  stating, when asked by the press whether the missile-critical technology of Dolphin Integration

17  had been at risk of falling into foreign, non-French, hands: "This shows the commitment of

18  MBDA to be a responsible player in the French defense community when sources of supply are

19  potentially at risk."

20    35.    Once news of the secret take-over went public, Soitec immediately gained

21  €150,000,000 in market value.

22    36.    Plaintiff Aldini, a Swiss merchant banking firm that invest more than €100 million

23  per year in small/medium sized enterprises and publicly quoted companies, had acquired a

24  significant strategic equity stake in Dolphin Integration with the aim to acquire it.

25    37.    Aldini had valued Dolphin Integration to be worth more than €649,000,000

26  (approximately $763,000,000).

27    38.    Aldini's experience with Mergers & Acquisitions, its valuation of Dolphin

28  Integration, the absence of more financially powerful legitimate good faith bidders, and Aldini's

and its clients' combined financial power meant that it was reasonably probable that Aldini would have acquired Dolphin Integration but for the Defendants' illegal conduct.

39.     On information and belief, through their illegal behavior, unfair competition, fraudulent business acts and practices, illegal insider dealing, securities law violations, and by perpetrating a fraud on the bankruptcy court, as alleged in further detail in this Complaint, the Defendants interfered with Aldini's prospective economic advantage, destroyed the value of its strategic equity stake in Dolphin Integration, and caused Aldini general and reputational damages.

40.     As a result of the Defendants' misconduct, Aldini seeks compensatory, consequential, and punitive damages.

**The Parties**

41.     Plaintiff Aldini AG is a company incorporated and registered under the laws of Switzerland with registration number UID CHE-114.348.088 and with its registered address at Roosstrasse 53, 8832 Wollerau, Switzerland.

42.     Defendant Silvaco, Inc. is a Delaware corporation registered with the California Secretary of State to do business in California (corporate number C2675421), with its headquarters at 2811 Mission College Boulevard, 6th floor, Santa Clara, CA 95054.

43.     Defendant MBDA France SAS is a French company registered under corporate number 378 168 470 RCS NANTERRE, with its registered address at 1 Avenue Réaumur, Le Plessis-Robinson 92350, France.

44.     Defendant MBDA Inc. is a Delaware corporation registered with the California Secretary of State to do business in California (corporate number C1692917), with its with its principal office in California at 16027 Ventura Blvd., Suite 501, Encino, CA 91436.

45.     Defendant Soitec USA Holding Inc. is a Delaware corporations registered with the California Secretary of State to do business in California (corporate number C3451936), with its principal office at 3322 Sweetwater Springs Blvd., Suite 105, Spring Valley, CA 91977.

46.     Defendant Soitec USA, LLC is a Massachusetts company registered with the California Secretary of State to do business in California (under number 201825610310), with its principal office at 3322 Sweetwater Springs Blvd., Suite 105, Spring Valley, CA 91977.

47.     Defendant Soitec S.A. is a French company registered under corporate number 384 711 909 RCS GRENOBLE, with its registered address at 922, Parc technologique des Fontaines, Chemin des Franques, Bernin 38190, France.

48.     Defendant the Republic of France is a foreign state, with its address at the French Ministry of Europe and Foreign Affairs (*Ministère de l'Europe et des Affaires Étrangères*), Hôtel du ministre des Affaires étrangères, 37 quai d'Orsay, Paris 75007, France.

49.     Defendant Ministère des Armées, is a political subdivision of the Republic of France, with its address at Hôtel de Brienne, 14 rue Saint-Dominique, Paris 75007, France.

50.     Defendant Direction Générale de l'Armement DGA, is an agency of the Republic of France, with its address at 60 boulevard Gén. Martial Valin, Paris 75015, France.

51.     On information and belief, Defendant Stéphane Kammerer, Deputy Director in the DGA's Operations Directorate, is an individual who lives and resides at in France.  Mr. Kammerer is a citizen of France.

52.     Defendant Dolphin Integration S.A. is a French company registered under corporate number 331 951 939 RCS GRENOBLE, with its registered address at 39 avenue du Granier, Meylan 38240, France.

53.     Defendant Dolphin Design SAS is a French company registered under corporate number 841 620 743 RCS GRENOBLE, with its registered address at 1 Bis A et 2A chemin du pré carré, Meylan 38240, France.

54.     On information and belief, Defendant Antoine Bouvier, former President of MBDA, is an individual who lives and resides in France.  Mr. Bouvier is a citizen of France.

55.     On information and belief, Defendant Henri Berger, former CEO of MBDA, is an individual who lives and resides in France.  Mr. Berger is a citizen of France.

56.     On information and belief, Defendant José Beriot, Soitec's Vice President of Special Operations and former member of the Board of Directors of Dolphin Integration, is an individual who lives and resides at 6 cité Malesherbes, Paris 75009, France.  Mr. Beriot is a citizen of France.

57.     On information and belief, Defendant Harold Van den Bossche, MBDA's Director Industrial Policy & Supply Chain Management and former representative for board member MBDA on the Board of Directors of Dolphin Integration, is an individual who lives and resides at 46 rue Cauchy, Paris 75015, France.  Mr. Van den Bossche is a citizen of France.

58.     On information and belief, Defendant Michel Depeyrot, co-founder, President, and member of the Board of Directors of Dolphin Integration, is an individual who lives and resides at 22 route de Chartreuse, Corenc 38700, France.  Mr. Depeyrot is a citizen of France.

59.     On information and belief, Defendant Christian Dupont, CEO of Dolphin Integration and later President of Dolphin Design, is an individual who lives and resides at 14 quai Romain Rolland, Lyon 69005, France.  Mr. Dupont is a citizen of France.

60.     On information and belief, Defendant Thierry Sommelet, President of Soitec, is an individual who lives and resides at 5 rue Léon Vaudoyer, Paris 75007, France.  Mr. Sommelet is a citizen of France.

61.     On information and belief, Defendant Paul Boudre, General Manager of Soitec, is an individual who lives and resides at 59 Cove Way, Seascape #01-19, Singapore 098309.  Mr. Boudre is a citizen of France.

62.     On information and belief, Defendant Iliya Pesic, Executive Chairman of the Board of Directors of Silvaco, is an individual who lives and resides in California.  Mr. Pesic is a citizen of the United States.

63.     On information and belief, Defendant Babak Taheri, CEO/CTO and Member of the Board of Directors of Silvaco, is an individual who lives and resides in California.  Mr. Taheri is a citizen of the United States.

64.     Plaintiff is ignorant of the true names and capacities of Defendants sued herein as Does 1-25, inclusive, and therefore sues those Defendants by such fictitious names.  Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.  Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by their conduct.

## II.

## JURISDICTION

65.     This Court has subject matter jurisdiction over this action because it has original jurisdiction pursuant to 28 U.S.C. §1330(a) because Defendant Republic of France is a "foreign state" pursuant to 28 U.S.C. §1603(a) and, as alleged further in this Complaint, it is not immune because it engaged in commercial activity as defined in 28 U.S.C. §1605(a)(2) and/or effectuated a taking in violation of international law as defined in 28 U.S.C. §1605(a)(3).

66.     This Court has subject matter jurisdiction over this action because it has original jurisdiction pursuant to 28 U.S.C. §1330(a) because Defendant Ministère des Armées is a "foreign state" because pursuant to 28 U.S.C. §1603(a) that term encompasses a "agency or instrumentality" of the Republic of France as defined in 28 U.S.C. §1603(b), and Defendant Ministère des Armées is not immune because it engaged in commercial activity as defined in 28 U.S.C. §1605(a)(2) and/or effectuated a taking in violation of international law as defined in 28 U.S.C. §1605(a)(3), as alleged further in this Complaint.

67.     This Court has subject matter jurisdiction over this action because it has original jurisdiction pursuant to 28 U.S.C. §1330(a) because Defendant Direction Générale de l'Armement DGA is a "foreign state" because pursuant to 28 U.S.C. §1603(a) that term encompasses an "agency or instrumentality" of the Republic of France as defined in 28 U.S.C. §1603(b), and Defendant Direction Générale de l'Armement DGA is not immune because it engaged in commercial activity as defined in 28 U.S.C. §1605(a)(2) and/or effectuated a taking in violation of international law as defined in 28 U.S.C. §1605(a)(3), as alleged further in this Complaint.

68.     This Court has personal jurisdiction over Defendant the Republic of France, Defendant Ministère des Armées, and Defendant Direction Générale de l'Armement DGA because this Court has personal jurisdiction over a foreign state, its agency or instrumentality as to every claim from which they are not immune pursuant to 28 U.S.C. §1605, once service of process has been effected under 28 U.S.C. §1608 pursuant to Rule 4(j)(1) Fed. R. Civ. P.

69.     The Republic of France, Ministère des Armées, and DGA are not immune pursuant to 28 U.S.C. §1605(a)(2) because as alleged further in this Complaint (i) this action is

11

COMPLAINT FOR DAMAGES

based upon acts performed in the United States by Soitec and Silvaco in connection with a commercial activity of the foreign state, the Republic of France, Ministère des Armées, and DGA, elsewhere, (ii) this action is based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States, and (iii) pursuant to 28 U.S.C. §1605(a)(3) because as alleged further in this Complaint this is an action in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state, and (iv) that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

70. This Court has subject matter jurisdiction over this action because it has original jurisdiction pursuant to 18 U.S.C. §1836(c) over the private civil actions brought pursuant 18 U.S.C. §1836(b)(1) in this Complaint, including pursuant to 18 U.S.C. §1837 (the Defend Trade Secrets Act) for conduct outside the United States because, as alleged in this Complaint, the conditions set out in 18 U.S.C. §§1837(1) and 1837(2) have been satisfied.

71. This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because it has original jurisdiction of all civil actions arising under the laws of the United States.

72. This Court has supplemental jurisdiction over all other claims in this action pursuant to 28 U.S.C. §1367(a) because they are so related to the claims in this action within such original jurisdiction, as provided for by 28 U.S.C. §1330(a), §1331, and 18 U.S.C. §1836(c), that they form part of the same case or controversy under Article III of the United States Constitution.

73. This Court has personal jurisdiction over the other Defendants because they are either resident or do business in California or have conducted themselves, as set out in detail in this Complaint, such that the exercise of personal jurisdiction over each of those Defendants in California is consistent with the California long-arm statute Cal. Code Civ. Proc § 410.10, the Constitution of the State of California, and the Constitution of the United States.

74.     Besides the general and specific jurisdiction over the other Defendants mentioned above and demonstrated by the facts pleaded in this Complaint, this Court also has specific personal jurisdiction over the non-California based Defendants because on information and belief they conspired with the California-based Defendants Silvaco, Pesic, Taheri, and Soitec USA, and based on the overt acts carried out in California in furtherance of that conspiracy, such as set out in detail in this Complaint, including the sale to Silvaco in California of the non-defense related assets and IP that Defendants MBDA and Soitec stripped from Dolphin Integration, and the transfer of those assets into California on the behest of and through the actions of Defendants MBDA, Soitec, Ministère des Armées, DGA, and the Republic of France, as set out in this Complaint, in order to put those assets and IP beyond the reach of the French bankruptcy court and those that appealed its decisions and who could have bid for them in a public bankruptcy tender and sale but for the Defendants' unlawful conduct and fraud perpetrated on the bankruptcy court.

75.     This Court also has alter-ego jurisdiction over Defendant Soitec based on the presence of Soitec USA in California, because on information and belief the latter is treated by Soitec not as regular subsidiary but as one and the same company.

76.     This Court also has personal jurisdiction over Defendant Soitec based on the representative services doctrine, because on information and belief Soitec USA is treated by Soitec regarding the facts pleaded in this Complaint, and more generally, not as regular subsidiary, but Soitec USA functions as an agent or instrumentality of its parent corporation.

77.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(3) because there is no district in which an action may otherwise be brought as provided in section 1391, and therefore venue is proper in any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action, while Defendants Silvaco, Pesic, Taheri, and Soitec USA are resident here for purposes of venue pursuant to 28 U.S.C. §1391(c)(2) and (d).

78.     The San Jose Division is the proper venue for this action because Silvaco has its main place of business and headquarters in Santa Clara County, while Civil L.R. 3-2(e) states that

1   "all civil actions which arise in the counties of Santa Clara . . . shall be assigned to the San Jose

2   Division."

### III.

### FACTS

### Aldini Acquires a Strategic Stake in Dolphin Integration

6        79.     Aldini is a Swiss merchant banking firm (https://www.aldinicapital.com).

7        80.     Aldini and its affiliates have more than US$3 billion under management and invest

8   more than €100 million per year in small/medium sized enterprises and publicly quoted

9   companies.

10       81.     Aldini has several offices in Switzerland, and it has an office also in both

11  Liechtenstein and the British Virgin Islands.

12       82.     Aldini analyzes many small and mid-sized companies to find potential acquisition

13  and take-over targets.  Aldini pursues such opportunities either on a proprietary basis or together

14  with one or more of its clients or as part of a syndicate.

15       83.     Daniel Baumslag, Aldini's Head of Debt & Equity Markets, in early 2017 started

16  analyzing Dolphin Integration which was publicly traded on the EURONEXT GROWTH stock

17  exchange (stock market with symbol: ADOL).

18       84.     Aldini's believed that Dolphin Integration was significantly undervalued.

19       85.     From mid-2017 onward, Aldini began to acquire shares in Dolphin Integration

20  until, by mid-2018, Aldini had acquired 28,466 shares amounting to a strategic equity position of

21  2.12% in Dolphin Integration.

22       86.     Given the limited free float due to that fact that the founders and their family

23  office, Fontclaire, held a significant number of Dolphin Integration shares, Aldini's was a sizable

24  strategic equity position in Dolphin Integration.

25       87.     Aldini acquired its strategic equity stake because its analyses showed that Dolphin

26  Integration was significantly under-valued and thinly traded, and Aldini had decided that it should

27  pursue an acquisition of Dolphin Integration based on it being under-valued, the company's

28  potential for growth, and its unique technology and intellectual property portfolio.

88.     Dolphin Integration's unique technology, designs, and services addressed both the needs of the fast-growing technology consumer markets and those of various industrial sectors, including the European defense industry.

89.     Aldini believed that the consumer electronics market was expanding rapidly, and Aldini saw that Dolphin Integration was well positioned to benefit.

90.     During January 2018, Dolphin Integration's market cap on the EURONEXT GROWTH stock exchange had exceeded €51,000,000.

91.     Based on Aldini's analysis of Dolphin Integration, including a DCF valuation and peer company and industry comparisons, Aldini calculated the true enterprise value of Dolphin Integration to be more than €649,000,000.

**MBDA's and Soitec's Dependency on Dolphin Integration**

92.     On information and belief, the MBDA defendants had been long-standing Dolphin Integration customers.

93.     On in formation and belief, MBDA had been facing resistance from the United States when selling missiles and missile systems to foreign governments, such as Egypt.

94.     One way for MBDA to evade the United States' objections and invoking its ITAR regulations to block such sales by MBDA, and to advance and develop its commercial business with foreign governments, was for MBDA to replace U.S.-manufactured missile components with French technology.

95.     On information and belief, in February 2018, the United States blocked the sale to Egypt of twelve French-manufactured Dassault Rafale jet fighters equipped with MBDA's SCALP cruise missiles.

96.     On information and belief, MBDA's SCALP cruise missile contained two US-manufactured components in its infrared system that guides the missile towards its target, which enabled the US to invoke its ITAR regulation to block the sale.

97.     On information and belief, ITAR's effect is a powerful weapon that incapacitates the competition and advances the foreign policy objectives of the United States.

15

98.     On information and belief, MBDA in early 2018 also learned that the United States intended to block the sale to Qatar of French-manufactured Rafale fighter jets equipped with MBDA's Meteor missiles, lending added impetus for MBDA's scheme to strip Dolphin Integration of its defense-related assets and IP to enable MBDA to use the same in its missiles to avoid the United States' ITAR-based objections.

99.     The French Minister of Defense, Ms. Florence Parly, made clear in her parliamentary testimony that the way for MBDA to deal with objections by the United States under its ITAR regulations – *e.g.*, the International Traffic In Arms Regulations, 22 C.F.R. 120-130 – was to obtain the technology that would enable MBDA to '*de-ITARize*' its products by replacing U.S.-manufactured components with French technology so as to evade U.S. objections to MBDA selling its armaments abroad.

100.    On July 4, 2018, Minister Parly testified before the National Defense and Armed Forces Commission of the French National Assembly (the French equivalent, roughly, of the House Armed Services Committee, a standing committee of U.S. House of Representatives) on the Report to Parliament on Arms Exports from France: "I come to the impact of ITAR regulations on French exports.  As everyone knows, these standards allow the United States to block foreign arms sales when components are manufactured in the United States go into their manufacture.  It is true that we are dependent on this mechanism: we are at the mercy of the Americans when our equipment is concerned.  Do we have the means to be totally independent American components?  I do not believe that.  Are we looking to improve the situation?  The answer is yes.  Why?  Because we are confronted in a concrete way with the brakes applied on the part of the American administration.  In the case cited by Mr. Ferrara, we failed to lift US opposition to the sale of SCALP missiles.  What is the solution to get out of it?  That the manufacturer of these missiles, namely MBDA, makes investments in research and technology to be able to manufacture an analogous component that would escape the ITAR mechanism."

101.    Soitec's core business is closely related to Dolphin Integration's and, on information and belief, makes use of the technology developed by Dolphin Integration for use in consumer goods and technology.

102.    On information and belief, Soitec needed Dolphin Integration's cutting-edge technology to participate in the exploding 'Internet-of-Things' market (*i.e.*, technology for consumer and other connected devices using integrated circuits, optimized for very low energy consumption).

103.    On information and belief, Dolphin Integration's research, services, and products comprised and were based on intellectual property that others, including MBDA, Soitec, and Silvaco, did not have access to otherwise.

**MBDA, Soitec, and Silvaco Set Out to Wrest Control of Dolphin Integration**

104.    On information and belief, MBDA and Soitec had tried to acquire Dolphin Integration, but their efforts failed because its founder Michel Depeyrot did not wish to step aside as the company's president.

105.    On information and belief, the MBDA and Soitec Defendants then set out to wrest control of Dolphin Integration from its shareholders, including Aldini, by subterfuge and fraud to obtain Dolphin Integration's unique technology and IP to integrate it into their own products and for the Silvaco/Soitec USA/Soitec joint venture in California.

106.    Aldini fell victim to the French government defendants' and MBDA's commercial gamesmanship through which they were attempting to side-line the United States and avoid its ITAR-based objections, and to better compete with the United States' national defense industry, and to Silvaco's and the Soitec defendants' plans to expand into the U.S. semiconductor and microprocessor technology market with Dolphin Integration's non-defense related assets and IP.

107.    On information and belief, Silvaco and the Soitec defendants were motivated by their own commercial gain and were richly rewarded for their participation in the conspiracy, once the French government defendants and MBDA achieved their objective of sidelining the United States and its defense industry by snaring those parts of Dolphin Integration's technology and intellectual property that would help MBDA evade the United States' ITAR-based objections to MBDA's international arms sales.

108.    Defendant Bouvier, MBDA's then President, publicly admitted that the "objective is to avoid the takeover of this business by potentially non-European, hostile players" including

1    Aldini, on information and belief, to enable MBDA and MBDA Inc. to expand their international

2    arms sales.

3         109.    On information and belief, Bouvier also publicly admitted that the French

4    government and its co-conspirators were active participants in this scheme aimed at the United

5    States when he declared that MBDA drove Dolphin Integration into bankruptcy and destroyed

6    Aldini's economic advantage in order: "to avoid the resumption of this activity by potentially

7    hostile non-European actors.  So, we acted quickly, we acted with partners, we have acted with

8    the DGA.  Beyond the amount, it is the capacity to be a responsible actor and when there is a

9    sector of sovereignty which is a sector at risk, well, one takes actions and one organizes oneself

10   so that this risk is limited."

11        110.    On information and belief, obtaining the cooperation of Silvaco, Soitec, and Soitec

12   USA in California was crucial in this respect.

13        111.    Soitec's participation ensured that once Dolphin Integration was tipped into

14   bankruptcy by the (in)action of its board of directors – including the Trojan Horse directors that

15   MBDA and Soitec had infiltrated – a purportedly viable non-defense industry focused buyer, such

16   as Soitec, was available to falsely pretend to want to continue Dolphin Integration and save its

17   employees from redundancy.

18        112.    On information and belief, Silvaco, Soitec, and Soitec USA were assured by

19   Defendants the Republic of France, Ministère des Armées, DGA, and MBDA that they would be

20   allowed to spirit the non-defense related assets away to California for their joint venture there to

21   create and expand a beachhead in the United States' microprocessor industry, assuring the

22   Republic of France, Ministère des Armées, and the DGA of access to scarce microprocessor

23   resources.

24                     **The French State's Commercial Interference**

25        113.    On information and belief, the DGA, the French government's defense

26   procurement agency in charge of the development and purchase of weapon systems for the

27   French military and promotion of French foreign arms sales, designated Stéphane Kammerer, the

28   Deputy Director of its Helicopter and Missile Management Unit within the DGA's Operations

Directorate ("DO"), as the point of contact for the Dolphin Integration take-over scheme and conspiracy.

114. On information and belief, Stéphane Kammerer is a high-ranking officer in the French Corps of Weapons Engineers (*Corps des Ingénieurs de L'armement*) responsible for supervising the French Aerospace and Defense industry, and has worked for the DGA since 1994.

115. On information and belief, another officer of the *Corps des Ingénieurs de L'armement*, was the DGA liaison officer embedded with MBDA.

116. On information and belief, Stéphane Kammerer and the liaison officer at MBDA where in frequent direct and indirect contact concerning the take-over, asset stripping, and destruction of Dolphin Integration by the MBDA and Soitec defendants, and Silvaco.

117. On information and belief, Bouvier and Stéphane Kammerer know each other personally and have met on various occasions, including on March 28, 2017, when they, together with the head of the DGA, attended the signing by the French and UK governments of an agreement to launch the joint concept phase for the Future Cruise/Anti-Ship Weapon ("FC/ASW") development program with MBDA.

118. On information and belief, Bouvier holds some of the highest civilian awards bestowed by the French government for services to the Republic of France, and he is in frequent contact with the French State at the highest levels when it comes to commercial defense matters.

119. On information and belief, Bouvier has personally met with many French Presidents, including President Jacques Chirac and Nicolas Sarkozy, and has held personal meetings with French Presidents François Hollande and Emmanuel Macron between April-June 2017, around the time of the Presidential hand-over between them.

120. On information and belief, Bouvier was considered for the position as the Head of the DGA to succeed Mr. Laurent Collet-Billon at the onset of the Macron Presidency but narrowly missed out.

121. One of the official tasks of the DGA is to promote French international arms sales and exports. In 2016, Laurent Collet-Billon, then head of the DGA, said it planned to recruit 160 officials just to support commercial arms exports.

122.     On information and belief, showing that he is a 'good soldier' and demonstrating his reputation as the go-to 'can-do'-person for the French government when it comes to commercial defense matters, Bouvier tried to justify the secret take-over of Dolphin Integration via the secret pre-pack proceeding, and the fraud perpetrated on the bankruptcy court, by stating, when asked by the press about MBDA's role and whether the missile-critical technology of Dolphin Integration had been at risk of falling into foreign, non-French, hands: "This shows the commitment of MBDA to be a responsible player in the French defense community when sources of supply are potentially at risk."

123.     According to press reports, the DGA may well be Mr. Bouvier's next career move after his current role as the Head of Strategy, Mergers & Acquisitions at Airbus, co-owner of MBDA.  "His appointment will be very credible with the French government," reported an anonymous source, said to be familiar with Bouvier's newest role.

124.     On information and belief, sensitive commercial defense-related operations in France, such as the asset stripping and destruction of Dolphin Integration, a stock-exchange listed company, require prior approval by the French State, and MBDA and Bouvier would not have endeavored to undertake such an operation without approval by and instructions from Defendants Ministère des Armées, DGA, and the Republic of France.

125.     On information and belief, through their contacts with MBDA, the Republic of France, Ministère des Armées, and DGA instigated, approved, directed, and participated in driving Dolphin Integration into bankruptcy and asset stripping the company to prevent its defense-related assets and IP from falling into foreign, *i.e.* non-French hands and to secure its defense-related IP and assets for MBDA to protect its foreign arms sales and exports, and to ensure the dispersal of the remaining non-defense assets and IP to the Soitec defendants and Silvaco in California.

### The Defendants' Scheme to Bankrupt Dolphin Integration

126.     The MBDA and Soitec defendants drove Dolphin Integration into bankruptcy to, furtively, grab the company's assets, IP, trade secrets, and business for a mere €200,004

(approximately $235,000), while at the same time preventing competing bidders, such as Aldini, from learning about the opportunity.

127.   On information and belief, Dolphin Integration's financial 'problems' that later led to its reorganization and bankruptcy proceedings in France were largely manufactured by MBDA and Soitec.

128.   On information and belief, Dolphin Integration's financial predicament that ultimately led to its insolvency and bankruptcy was entirely artificial and avoidable.  It was a sham and part of the Republic of France's, Ministère des Armées', DGA's, and MBDA and Soitec defendants' scheme to drive Dolphin Integration into a bankruptcy procedure to enable these Defendants to then secretly take over all Dolphin Integration's assets, IP, and trade secrets.

129.   On information and belief, a significant part of these assets, IP, and trade secrets were subsequently transferred to California to keep them outside of the reach of Aldini and the French courts, and to use them to advance the Defendants' commercial position and influence in the United States' microprocessor and consumer technology market, in accordance with the common plan between MBDA, MBDA Inc., Ministère des Armées, DGA, the Republic of France, Soitec, Soitec USA, and Silvaco.

130.   The true financial issues that Dolphin Integration had experienced were basically growing pains typical of many high-growth tech companies that Aldini invested in.

131.   Dolphin Integration's real financial issues were minor compared to Dolphin Integration's financials and future earning potential.

132.   On information and belief, additional bank financing and cash injections by shareholders were available but were ignored by Dolphin Integration's board and went unused.

133.   On information and belief, MBDA and Soitec deliberately created an insurmountable financial predicament for Dolphin Integration through the activities and inaction of their Trojan Horse directors, Messrs. Van den Bossche and Beriot, whom they had infiltrated onto Dolphin Integration's board of directors.

134.   On information and belief, Messrs. Van den Bossche and Beriot acted as a Trojan Horse and fed confidential and sensitive Dolphin Integration financial and commercial inside

1    information and trade secrets back to their employers, MBDA and Soitec.  This enabled them to

2    formulate a secret pre-packed takeover plan and offer.

3        135.    On information and belief, Messrs. Van den Bossche and Beriot were instrumental

4    in ensuring that Dolphin Integration and its board did not obtain additional bank financing and

5    refused cash injections and additional capital offered by Dolphin Integration's shareholders.

6        136.    The resulting financial denouement of Dolphin Integration opened the gate for the

7    MBDA and Soitec defendants' and Silvaco's raid, asset strip, and destruction of Dolphin

8    Integration.

9        **MBDA and Soitec Implement the Defendants' Plan to Asset Strip Dolphin Integration**

10       137.    On May 5, 2017, Soitec employee Mr. José Beriot became a director on the

11   Dolphin Integration board.

12       138.    On information and belief, while Beriot pretended to take his board seat in his

13   private capacity, he was in fact acting on behalf of Soitec.

14       139.    On June 20, 2017, MBDA employee Mr. Harold van den Bossche became a

15   director and representative for MBDA on the Dolphin Integration board.

16       140.    On information and belief, Defendants Van den Bossche and Beriot started feeding

17   confidential and sensitive inside information and trade secrets they learned as board members of

18   Dolphin Integration, including financial information about the company's affairs, to their

19   respective employers, MBDA and Soitec.

20       141.    In January 2018, Dolphin Integration announced a 29% increase in sales revenue,

21   and in April 2018 announced that sales revenue was "up 16% compared to last year" and that this

22   "sharp increase reflects the desired inflection for product sales, which is driving sustainable

23   growth for the company."  Thus, on information and belief, things were going very well for

24   Dolphin Integration.

25       142.    On information and belief, in the meantime, MBDA and Soitec's Trojan Horse

26   board members at Dolphin Integration fed the company's inside information and trade secrets to

27   their employers who secretly used it to put together a pre-pack take-over offer for all of Dolphin

28   Integration's assets and IP.

COMPLAINT FOR DAMAGES

143.    On June 5, 2018, at the request of Dolphin Integration's Board, a bankruptcy reorganization proceeding was opened by the President of the Commercial Court in Grenoble, France, and the court appointed Bruno Sapin of the firm AJ Partenaires as the trustee in charge of the reorganization.

144.    Article L. 642-3 of the French Commercial Code prohibits the corporate officers of a company placed in judicial liquidation to make a take-over offer for the company or its assets, either directly or through an intermediary.

145.    Art. L. 642-3 states: "Neither the debtor, in respect of any of his property, nor the de jure or de facto manager of the legal person in liquidation, nor the relatives or associated persons up to the second degree inclusive of these managers or of the natural person debtor, nor the persons having or having had the capacity of controller during the procedure are allowed, directly or through an intermediary, to present an offer.  Likewise, these persons are prohibited from acquiring, within five years following the sale, all or part of the assets included in this sale, directly or indirectly, as well as from acquiring shares or equity securities of any company having in its property, directly or indirectly, all or part of these assets, as well as securities giving access, within the same period, to the capital of this company [. . .] Any act in violation of this article is annulled at the request of any interested party or the public prosecutor, presented within three years from the conclusion of the act.  When the act is subject to publicity, the period starts from this."

146.    On June 5, 2018, the same day that this reorganization proceeding was ordered by the court, MBDA's Mr. Van den Bossche resigned as a board director at Dolphin Integration, but the resignation was kept a secret and not published until months later.

147.    On June 6, 2018, Dolphin Integration issued a Press Release, titled "DOLPHIN INTEGRATION UPDATES ITS PERSPECTIVES FOLLOWING THE POSTPONEMENT OF AN IMPORTANT ORDER."  However, Dolphin Integration never revealed which order, for what products or for how much money, and from whom.

148.    Dolphin Integration's Press Release stated further: "the corporate management of a historical customer . . . has decided to postpone one of its strategic programs."  Again, Dolphin

1    Integration never revealed which "historical customer," or which "strategic program" was

2    postponed or for how long.

3        149.    The Press Release stated: "the liquidity risk is increased" but mentioned that "[i]n

4    order to overcome this situation . . . in the context of the authorization given to the Board of

5    Directors . . . to carry-out a capital increase or bank financing, the company's initiatives are in

6    process for strengthening its operating funds."

7        150.    The Press Release also stated: "the company, as a key supplier, is implementing a

8    bridging solution to compensate this lag-time of the delayed program mentioned herein above, by

9    relying on other historical customers able to accelerate their programs."

10       151.    As merchant bankers, Aldini knew that there was no reason why a company with

11   the earning capacity of Dolphin Integration, and major clients such as MBDA, could not obtain

12   debt financing or raise additional equity.  Dolphin Integration's Press Release assured Aldini that

13   the Dolphin Integration board had been tasked to do so.

14       152.    As a result, Dolphin Integration's June 6, 2018, Press Release, despite its

15   mysterious references to an important cancelled order, strategic programs, and an undisclosed

16   long-term customer, was not of any great concern to Aldini.  Dolphin Integration's statement that

17   it would "carry-out a capital increase or bank financing" and implement a "bridging solution"

18   seemed the logical solution to the purported order-related issue it said it had encountered.

19       153.    Aldini was later told by two of Dolphin Integration's co-founders, Messrs. Jean-

20   François Pollet and Louis Zangara, that there existed no customer of Dolphin Integration whose

21   business with the company was such that the cancelation of any single order, by itself, could tip

22   Dolphin Integration into bankruptcy.

23       154.    On information and belief, in light of Dolphin Integration's earning potential and

24   market capitalization, it was implausible that the cancellation of any single order could suddenly

25   tip the company into insolvency.

26       155.    From a corporate finance perspective, and based on Dolphin Integration's public

27   statements, there was no way for Aldini or, on information and belief, shareholders to suspect or

28

anticipate that Dolphin Integration was at risk of going bankrupt, let alone that its assets might be put up for sale in an insolvency proceeding.

156.    Aldini was looking at Dolphin Integration as a takeover target.

157.    Based on the information the company was publishing it appeared that the company would emerge even stronger, hence Aldini decided to further increase its equity position.

158.    Despite that Dolphin Integration's Press Release stated that the company needed a cash infusion, on information and belief, the Dolphin Integration Board of Directors refused to raise capital by issuing shares or to arrange for additional bank financing.

159.    Despite the company's statement that the board had specifically been mandated to do so, on information and belief, it did not even try.

160.    On information and belief, Dolphin Integration's board of directors deliberately did nothing and sat on its hands.  Thus, purposefully acting directly contrary to what it had told the market it would do.  Thereby exacerbating a manufactured financial 'crisis' to provide, what in retrospect became apparent, a pretext and opening for a corporate raid by MBDA and Soitec.

161.    On information and belief, Dolphin Integration never mentioned anything again publicly about the mysteriously disappearing "important order", cancelled "strategic program", or who the "historical customer" was that purportedly had tipped Dolphin Integration into the financial abys that later was used to justify MBDA/Soitec's secret pre-pack takeover of the company's asset and business for €200,004 while the market had valued the company at more than €51 million, and while Aldini's financial analysis showed it was worth more than €649,000,000.

162.    On July 6, 2018, Mr. Henri Berger (CEO of MBDA) filed an affidavit with the bankruptcy court swearing that MBDA did not fall under the prohibition against insider dealing of Art. L. 642-3.

163.    That same day, MBDA and Soitec filed a secret pre-pack take-over offer for all the assets and IP of Dolphin Integration.

164.    The secrecy of the pre-pack bankruptcy proceeding, and the absence of any notice and complete lack of any opportunity to be heard, is further illustrated by the fact that to this day, despite numerous formal requests, Aldini has not yet been provided a copy of MBDA/Soitec's July 6, 2018, pre-pack offer.

165.    On July 13, 2018, MBDA and Soitec filed an updated secret pre-pack take-over offer for all the assets and IP of Dolphin Integration for a cash payment of only €200,004, without either MBDA, Soitec, the trustee or the Court having arranged for it to be published or any notification whatsoever to Aldini or the other Dolphin Integration shareholders.

166.    On July 16, 2018, Dolphin Integration issued a Press Release that stated: "DOLPHIN INTEGRATION declares itself in a state of cease of payments leading to the request for opening of a recovery procedure.  Following its announcement of the cease of payments on July 16, DOLPHIN INTEGRATION announces today that it has requested and obtained, with the unanimous support of its Board of Directors, the opening of a receivership procedure with the Commercial Court of Grenoble . . . DOLPHIN INTEGRATION will communicate at any new stage of the procedure."

167.    The Press Release was misleading because Dolphin Integration did not reveal that the pre-pack takeover offers had already been filed with the court.  Nor did Dolphin communicate "any new stage of the proceedings" as it kept secret the pre-pack takeover of its assets and IP.

168.    Aldini and the other Dolphin Integration shareholders were not given notice that, rather than reorganize, Dolphin Integration's business and assets were for sale.

169.    The proceeding in which MBDA and Soitec raided Dolphin Integration and stripped it of its assets, including all its IP, was kept secret.

170.    On July 19, 2018, Dolphin Integration issued Press Releases and announced: "An observation period expiring in mid-January 2019 should be opened to allow the company to find the solutions to ensure the sustainability of its activities . . . the company will communicate any new stage of the procedure . . . The company aims to be a global player," without mentioning the MBDA/Soitec pre-pack take-over offers for all Dolphin Integration's business, assets, and IP that

had been completed and filed with the Court already on July 6 and 13, 2018 and that would lead inexorably to Dolphin Integration's liquidation.

171.    On information and belief, through these Press Releases, MBDA/Soitec and their employees Messrs. Van den Bossche and Beriot, who had taken board seats at Dolphin Integration, further deceived Aldini by hiding that Dolphin Integration's business and assets, including that company's IP and trade secrets, were being sold and that the proceeding, rather than "allow the company to find the solutions to ensure the sustainability of its activities," was designed to put Dolphin Integration out of business and to put its assets and IP beyond reach by dispersing them to MBDA and to Soitec USA/Silvaco in California.

172.    Accordingly, Aldini and the stock market were given to believe that the Dolphin Integration board of directors would be using the period until January 2019 – half a year – to obtain debt and equity financing, to reschedule its debts, to address any liquidity issues and would emerge stronger, "a global player" as the Dolphin Integration Press Release said.

173.    The message that "the company will communicate any new stage of the procedure" was not lost on Aldini either, and it therefore trusted and relied on any negative development or unexpected turn of events being shared with the stock market and with Dolphin Integration's shareholders because Dolphin Integration was a publicly listed company.

174.    On information and belief, the Dolphin Integration press releases were issued on the instigation and with the approval of Defendants Beriot, Van Den Bossche, Depeyrot, and Dupont.

**The Shareholders' Offers of a Financial Lifeline Are Turned Down**

175.    On July 19 and 20, 2018, Mr. Thierry Boutin, who was a Dolphin Integration shareholder, repeatedly offered to inject €2.5 million cash into Dolphin Integration to help it to address what the company had made the market believe was a purely temporary liquidity issue.

176.    On information and belief, Dolphin Integration while acknowledging receipt of Mr. Boutin's messages, then purposefully ignored Mr. Boutin's offer of a cash injection.

177.    On July 19, 2018, at 5:19 p.m. local time, Mr. Boutin wrote to Defendant Depeyrot, Dolphin Integration's President: "Please let me know the decision of the commercial

court of Grenoble, insofar as I still do not see any publication on your site or publish a message on your site.  Need the capital injection of 2.5 million euros or not?"

178.    That same day, at 5:31 p.m. local time, Defendant Depeyrot responded to Mr. Boutin: "There is of course a need to inject capital but above all to present a plan of continuation of activity.  Turn-arounds are in the process of being put together because various shareholders notified by the declaration of termination of payment have come forward for this purpose.  The court will always prefer a continuation plan to a sales plan."

179.    On July 20, 2018, at 4:18 p.m. local time, Defendant Depeyrot wrote to Mr. Boutin: "If you wish to declare for a capital increase, you must contact Me. Blanc-Lapierre (copied)."

180.    Mr. Blanc-Lapierre was the bankruptcy trustees for Dolphin Integration.  He is a partner at AJ Partenaires, and colleague of and co-trustee for Dolphin Integration with Mr. Sapin.

181.    That same day at 4:48 p.m. local time, Mr. Boutin wrote to Mr. Blanc-Lapierre: "As I indicated to Mr Depeyrot and as part of a continuation plan project, I could be interested in partnership with other shareholders that I represent to invest 2.5 million euro in the company Dolphin integration . . . Please give me information about the company and how to proceed if necessary.  We could also be interested, if it is a simpler and above all faster scheme, to buy back the shares of the company from Fontclaire so that it can reinvest the amount of the sale . . . it is much faster and allows immediately to give breathing space to company before a broader capital increase that could be conducted in a second time.  You can get in touch with me by phone or email to discuss and tell me what to do."

182.    On information and belief, despite the purported financial crisis, and while the Dolphin Integration board with Messrs. Van den Bossche and Beriot failed to organize additional bank financing or a capital increase, Mr. Blanc-Lapierre deliberately ignored Mr. Boutin's offer.

183.    On August 21, 2018, at 1:12 p.m. local time, Mr. Boutin wrote to Mr. Blanc-Lapierre: "My email of July 20th, seems to have remained unanswered.  Could you please answer it."

184.    Unbeknownst to Aldini and, on information and belief, unbeknownst to Mr. Boutin, on that day the court, having fallen prey to MBDA's, Soitec's, and Silvaco's fraud on the court, allowed the pre-pack offer to go forward.

185.    On information and belief, other shareholders, including Groupe David Gerbier and CLEG Mobilités-Gerbier, both owned by Mr. David Gerbier, also offered to put in an amount of money sufficient to avoid any insolvency situation for Dolphin Integration but these shareholders, too, were rebuffed or ignored.

186.    On information and belief, Dolphin Integration's board of directors, under the influence of MBDA and Soitec, and their Trojan Horse board members Van den Bossche and Beriot, exacerbated the company's financial situation by refusing to act and by turning down or ignoring offers of cash assistance.

**MBDA and Soitec Implement the Defendants' Plan Through Illegal and Wrongful Acts**

187.    In July 2018, Dolphin Integration's shareholders, including Aldini, and the stock market were kept in the dark and misled to believe that Dolphin Integration's board of directors was using the period until January of the following year (2019) to raise financing.

188.    MBDA and Soitec, instead of waiting for Dolphin Integration to utilize that period to raise financing to save the company and ensure its continued operation, rushed through their pre-pack offer during the summer vacation in France by perpetrating a fraud on the court, while virtually the entire country famously shuts down every August.

189.    Dolphin Integration issued and Aldini received various misleading Press Releases, suggesting that Dolphin Integration was working through its financial issues and would emerge financially healthy or would offer its assets and IP for sale.

190.    On information and belief, Messrs. Van den Bossche and Beriot, using their position as members of the Dolphin Integration board of directors, were involved with, and approved these Press Releases in keeping with the MBDA, Soitec, and Silvaco and other Defendants' common plan to asset strip Dolphin Integration and to destroy it.

191.    On February 13, 2018, Dolphin Integration stated in a Press Release: "Dolphin Integration is working in parallel on strengthening its equity capital to finance its growth in the next fiscal year."

192.    This Press Release was misleading because despite that the company's board of directors had been mandated to raise additional capital and financing, on information and belief, the Dolphin Integration board of directors deliberately did nothing.

193.    On April 9, 2018, Dolphin Integration stated in a Press Release: "This sharp increase reflects the desired inflection for product sales, which is driving sustainable growth for the company.  On this basis, the Board mandates the management team assembled by the CEO to finalize the new five-year plan within two weeks."

194.    On information and belief, this Press Release was misleading because the Dolphin Integration defendants, and the MBDA and Soitec defendants – as well as Messrs. Van den Bossche and Beriot who had seats on Dolphin Integration's board of directors – had no intention to continue Dolphin Integration as a going concern, let alone for five years.

195.    On June 6, 2018, Dolphin Integration stated in a Press Release: "the corporate management of a historical customer . . . has decided to postpone one of its strategic programs . . . to overcome this situation, the company, as a key supplier, is implementing a bridging solution . . . relying on other historical customers able to accelerate their programs . . . Furthermore, in the context of the authorization given to the Board of Directors by the mixed General Assembly of Shareholders on February 8, 2018, in order to carry-out a capital increase or bank financing, the company's initiatives are in process for strengthening its operating funds."

196.    On information and belief, the Press Release was misleading because there exists no "historical customer" as mentioned that endangered the financial well-being of Dolphin Integration, or if there was, then the cancellation of its orders was designed to drive Dolphin Integration into bankruptcy, while the board of directors – including defendants Van den Bossche and Beriot – deliberately refused to carry-out a capital increase or obtain bank financing.

197.    On July 13, 2018, Dolphin Integration stated in a Press Release: "DOLPHIN INTEGRATION has requested from EURONEXT GROWTH the trading suspension of its shares . . . in the wake of an announcement about the progress of its financial restructuring."

198.    The Press Release was misleading because, unbeknownst to the outside world and Dolphin Integration's shareholders, on July 6 and 13, 2018, MBDA and Soitec had filed their pre-pack take-over offers for all the assets and IP of Dolphin Integration that, on information and belief, were designed to drive the company into liquidation, asset strip, and destroy it.

199.    On July 16, 2018, Dolphin Integration stated in a Press Release: "contribution of equity by investors could not be realized for the time being . . . DOLPHIN INTEGRATION declares itself in a state of cease of payments leading to the request for opening of a recovery procedure . . . in order to fix the cash flow difficulties of the company, DOLPHIN INTEGRATION was unable to raise in time the funds needed . . . DOLPHIN INTEGRATION will communicate at any new stage of the procedure . . . The company aims to be a global player."

200.    The Press Release was misleading because, on information and belief, Dolphin Integration ignored and declined several million Euros, the equivalent to several million dollars, of financial support offered by shareholders in order to assist Dolphin Integration deal with its cash flow situation.

201.    On information and belief, reality was that Dolphin Integration was not unable to raise funds in time.  Instead, MBDA and Soitec had filed their pre-pack offers with the aim to asset strip and destroy Dolphin Integration to deny others, including Aldini, access to Dolphin Integration's assets and IP.

202.    On July 19, 2018, Dolphin Integration stated in a Press Release: "A procedure of legal redress should be opened . . . on July 24, 2018 . . . to look for solutions aiming at ensuring the continuation of operations . . . An observation period expiring in mid January, 2019 . . . to allow the company to find the solutions to ensure the sustainability of its activities . . . the company will communicate any new stage of the procedure . . . The company aims to be a global player."

203.    The Press Release was misleading because, on information and belief, Dolphin Integration, its management, and its directors, including Depeyrot, Dupont, Beriot, and Van den Bossche, knew that there would be no observation period until mid-January 2019 – half a year – because they had received MBDA/Soitec's July 6 and 13, 2018, pre-pack take-over offers for the immediate sale of the company's business, including all its assets and IP.  MBDA and Soitec had filed their pre-pack takeover offers on July 6 and 13, 2018, and the Defendants had approved of the same, and the pre-pack offer envisioned the immediate sale of all Dolphin Integration's assets and IP, and the company's liquidation.

204.    On July 26, 2018, Dolphin Integration stated in a Press Release: "The management team is developing with the insolvency administrator an ongoing business continuity plan, which is of interest to various shareholders and potential investors and the company has put in place the specific procedures of data room . . . possible solutions . . . the continuity of its operation, or that aiming at the sale of the company's assets . . . uncertainties affecting the valuation of intangible assets justify the postponement of the publication of the financial accounts . . . The company has asked EURONEXT GROWTH to resume the listing of its ALDOL share at the opening of the Paris stock exchange on Friday, July 27, 2018."

205.    The Press Release was misleading because, on information and belief, Dolphin Integration and Defendants Depeyrot, Dupont, Beriot, and Van den Bossche knew that there would be no sale of the company's assets to anyone besides MBDA and Soitec who had filed their pre-pack takeover offers on July 6 and 13, 2018, already, and the Defendants had cooperated with the same.

206.    On information and belief, Dolphin Integration did not prepare or make available a "data room" for potential acquirers.

207.    On the contrary, Dolphin Integration refused to publish its financial accounts so that any other potential buyers, besides MBDA and Soitec, were likely to be deterred absent requisite financial information and were kept at bay by the empty promise of a data room being made available until it was too late and MBDA/Soitec had stripped Dolphin Integration of all its assets and IP and destroyed the company.

208.    Through these statements Dolphin Integration, and Defendants Depeyrot, Dupont, Beriot, and Van den Bossche kept the shareholders, including Aldini, and the markets in the dark as to the true situation.  Namely, that the company was in the process of selling off all its assets and its entire business – including its unique intellectual property and its subsidiary companies – to MBDA/Soitec for a mere €200,004 while Dolphin Integration only recently had a market cap of more than €51 million.

209.    Because Dolphin Integration was a stock-exchange listed company, such an operation was in flagrant violation of French law and regulations as they apply to the stock exchange that required Dolphin Integration to inform the market and to follow the mandatory procedures that apply under such circumstances for the protection of shareholders who have acquired their securities on the stock market, such as Aldini.

210.    On information and belief, the Republic of France, Ministère des Armées, DGA, MBDA, Soitec, and Silvaco knew that the Press Releases were misleading and violated stock exchange regulations and French law.

211.    On information and belief, the Republic of France, Ministère des Armées, DGA, and the MBDA, Soitec, and Silvaco defendants knew of and encouraged the Defendants Dolphin Integration, Depeyrot, Dupont, Beriot, and Van den Bossche to issue the misleading Press Releases in furtherance of their conspiracy to strip Dolphin Integration of its assets and IP, so as to secure the defense assets and IP for MBDA, and the non-defense assets and IP for Soitec and Silvaco for use in California to establish a beachhead and expand into the U.S. microprocessor market.

**MBDA, Soitec, and Silvaco's Fraud on the Court Succeeds and They Strip the Assets and IP and Destroy Dolphin Integration, Blocking Others from Acquiring the Company**

212.    On information and belief, the Defendants' motive behind these misleading Press Releases was to ensure that the sale of all its assets took place secretly via the unpublished and secret pre-pack proceeding, while the shareholders, including Aldini, and market were lulled into waiting for the company to raise cash and to continue its operations or to offer them for sale.

213.   Long enough at least, in Mr. Bouvier's words (the then President of MBDA): "to avoid the takeover of this business by potentially non- European, hostile players" and for MBDA to snare the defense assets and for the remaining non-defense related assets and IP to be spirited off to California beyond the reach of the French court and those who might object, as Aldini did.

214.   On information and belief, in order to convince the French court not to seek alternative, competing bidders or a better price – the bankruptcy court expressed repeatedly that it deemed the price MBDA/Soitec offered to be unsatisfactory – or to offer the assets and IP via a public tender and regular bankruptcy sale, MBDA and Soitec pretended and represented that there were no other parties interested in Dolphin Integration and that no more money was available than the €200,004 that they had offered in their July 13, 2018, secret pre-pack offer.

215.   On information and belief, MBDA and Soitec did not disclose to the court that Silvaco was another buyer for the Dolphin Integration assets at that time.

216.   Silvaco would later pay at least €1,140,000 as its contribution to the acquisition for a part of the Dolphin Integration non-defense assets, IP, and trade secrets.

217.   On information and belief, MBDA and Soitec failed to inform the bankruptcy court of Silvaco's interest in the assets and IP, despite that Silvaco's French subsidiary was present in court in August 2018 to monitor the proceedings in connection with the planned Silvaco/Soitec USA/Soitec joint venture in California.

218.   On information and belief, Silvaco France was present in court at the behest of its parent company Silvaco.

219.   On information and belief, the MBDA and Soitec defendants told the bankruptcy court that their offer was formulated as part of a prepack offer: (i) in order allow a very rapid recovery of Dolphin Integration's activities and to safeguard the employment its employees, (ii) in order to minimize the deterioration of Dolphin Integration and the employment it offered, and (iii) to lessen the anxiety of the legal recovery process for Dolphin Integration's business partners and employees.  Thus, hiding the Defendants' plan to asset strip and destroy the company and its business.

220.    On information and belief, MBDA and Bouvier, directly or indirectly, reported back about the progress of the secret pre-pack court proceeding to the Republic of France, Ministère des Armées, DGA, and Kammerer.

221.    On information and belief, and unknown to Aldini at the time, Aldini subsequently learned that MBDA and Soitec falsely represented to the French bankruptcy court that there were no other interested buyers and that only €200,004 could be found for all the Dolphin Integration assets and IP combined while the MBDA and Soitec defendants, as well as Defendants Bouvier, Berger, Van den Bossche, Beriot, Pesic, and Taheri, knew that Silvaco was offering far more money for merely part of the Dolphin Integration assets and IP, and took part in the fraud perpetrated on the court.

222.    On information and belief, MBDA and Soitec falsely represented to the French bankruptcy court that MBDA/Soitec were not planning to break up Dolphin Integration and its business, while all along planning to re-sell part of its assets to Silvaco in California and to requisition the defense-related assets and IP for MBDA.

223.    On information and belief, MBDA and Soitec falsely represented to the French bankruptcy court that there were no other buyers, while they knew that Silvaco was another buyer and they contracted with Silvaco for the assets of Dolphin Integration.

224.    On information and belief, MBDA and Soitec did so to deceive the French court (and the French Public Prosecutor) into approving the pre-pack take-over of Dolphin Integration's assets.

225.    On information and belief, as part of the conspiracy with MBDA and Soitec, Silvaco hid from the bankruptcy court that it was a buyer willing to offer a multiple of what MBDA and Soitec were offering for the Dolphin Integration assets and IP, because doing so would have alerted the bankruptcy court to the fact that there were other buyers and that the assets and IP could attract more money, such as from Aldini.

226.    On August 3, 2018, at Soitec's initiative, a Special Purpose Vehicle ("SPV") was created under the name Dolphin Design for the purpose of acquiring the Dolphin Integration assets and IP to continue the business.

227.   It was not until August 19, 2018, that Mr. Van den Bossche's resignation as a director of Dolphin Integration was announced in the official French Government gazette (*Bulletin officiel des annonces civiles et commerciales*, also known by the acronym "BODACC").

228.   As a result, as far as third parties and Aldini are concerned, legally Mr. Van den Bossche was a member of the Board of Directors of Dolphin Integration until August 19, 2018.

229.   On August 21, 2018, the Commercial Court in Grenoble approved MBDA/Soitec's pre-pack take-over offer for all the assets, IP, and business of Dolphin Integration.

230.   Silvaco's French subsidiary, Defendant Silvaco France, was present in Court during the pre-pack take-over by MBDA and Soitec in August 2018.

231.   On information and belief, Silvaco France kept Silvaco and Soitec USA informed about the court proceedings and the success of the MBDA/Soitec pre-pack offer that would enable them to transfer part of the Dolphin Integration non-defense assets and IP to Silvaco in California for use in its joint venture with Soitec USA and Soitec there.

232.   On August 21, 2018, the French Commercial Court in Grenoble, without any advance warning, and without giving Aldini notice or an opportunity to be heard, approved the pre-pack sale of Dolphin Integration's business and all its assets and IP for a mere €200,004 in cash (approximately $235,000).

233.   On the announcement of the judgment concerning MBDA/Soitec's pre-pack take-over deal of Dolphin Integration's assets, Soitec's share price shot up 7%, representing €150,000,000 and, thus, the stock market at that moment valued Dolphin Integration's business and assets at approximately €250,000,000 (as Soitec had only a 60% interest in the acquired assets, while MBDA held the remaining 40%).

234.   Soitec's share in the pre-pack take-over was 60% because Soitec owned 60% of the SPV Dolphin Design in which MBDA/Soitec placed Dolphin Integration's assets.

235.   Mr. José Beriot (Soitec's Vice President of Special Operations) remained on the Dolphin Integration Board throughout and Soitec maintained that Mr. Beriot sat on Dolphin Integration's Board of Directors not for Soitec but purely as a matter of personal interest and that,

as a result, Soitec had not violated the legal prohibition against fraudulent sales and insider

dealing laid down in Article L. 642-3 of the French Commercial Code.

236.    On information and belief, the MBDA and Soitec defendants told the bankruptcy

court that they wanted the deeds of sale to be completed within a maximum of 4 months.

237.    Aldini sued challenging the deeds of sale so that the sale, as such, is not final.

238.    Nor is the August 21, 2018, judgment final because Aldini is appealing to the

European Court of Human Rights ("ECHR") based on the denial of due process that, if

successful, necessitates further judicial review and potentially a reversal of the bankruptcy court's

judgment approving the pre-pack sale.

### The Defendants Hide Their Fraudulent Scheme

239.    Despite that it became clear to Aldini when the August 21, 2018, judgment was

issued that the Press Releases and statements by Dolphin Integration that it was seeking

additional financing and capital and was using the half-year judicial observation period until

January 2019 to ensure its continuation, had been false and had been used as a subterfuge to keep

secret the pre-pack proceeding, MBDA, Soitec USA, Soitec, Silvaco, and the Ministère des

Armées, DGA, and Republic of France kept secret their scheme and conspiracy to asset strip and

destroy Dolphin Integration.

240.    On information and belief, MBDA and Soitec had told the bankruptcy court prior

to its August 21, 2018, judgment that they undertook not to sell Dolphin Integration's assets and

IP during the two years following the transfer even though, on information and belief, they had

agreed and conspired with Soitec USA, Silvaco, Ministère des Armées, DGA, and the Republic

of France to transfer a significant part of the Dolphin Integration non-defense assets to California

and to let MBDA remove or control the defense assets.

241.    The bankruptcy court in its August 21, 2018, judgment incorporated an injunction

against any sale of the Dolphin Integration's assets and IP for a period of two years, thus,

unwittingly helping the Defendants hide their conspiracy to transfer the non-defense assets and IP

to California and to abscond with the defense assets.

242.   The MBDA and Soitec defendants had promised the court to continue Dolphin Integration, and when the judgment was issued and became public on August 21, 2018, it stated such and approved the pre-pack offer on the basis that the Dolphin Integration business would be continued in Grenoble (France) with the assets and IP, albeit under the name of Dolphin Design to which MBDA and Soitec transferred the assets and IP.

243.   Because MBDA and Soitec kept their common plan and Silvaco's role in it secret, Aldini did not and could not know that the MBDA and Soitec defendants, Silvaco, Ministère des Armées, DGA, and the Republic of France, on information and belief, had agreed to transfer the non-defense related assets and IP to Silvaco in California and to secure the defense assets for MBDA.

244.   On May 25, 2020, Defendant Dolphin Design, which is owned and controlled by the MBDA and Soitec defendants, sought to lift the injunction and to obtain authorization to sell part of the Dolphin Integration assets, while hiding that there was a buyer and that it was Silvaco.

245.   Aldini was not given notice, was not allowed to participate, and had no opportunity to be heard or learn what transpired during the secret proceeding.

246.   In particular, Dolphin Design sought the bankruptcy court's permission to sell the Dolphin Integration memory compiler technology and standard cell libraries including all tangible and intangible assets linked to the activity, and to transfer all Dolphin Integration/Dolphin Design employee contracts mainly or substantially dedicated to the activity, as well as 100% of the share capital with voting rights of the company under Israeli law Dolphin Integration Ltd.

247.   Aldini was not given notice, could not and did not to participate, and had no opportunity to be heard during the secret proceeding or to find out what was discussed.

248.   On information and belief, MBDA, Soitec, Dolphin Design and the other Defendants perpetrated a second fraud on the bankruptcy court during this proceeding by failing to disclose that the re-sale of the Dolphin Integration non-defense assets and IP, and the destruction of Dolphin Integration, had been part of their common plan and conspiracy all along.

249.   On information and belief, MBDA, Soitec, Dolphin Design and the other Defendants perpetrated a second fraud on the bankruptcy court during this proceeding by failing

to disclose that they had never had any intention of continuing the Dolphin business but that their true aim and purpose had been to strip Dolphin Integration of its assets and IP and to destroy the company in service to their plan to circumvent the United States' ITAR regulations and to create a beachhead in the U.S. microprocessor industry.

250. When the judgment authorizing a sale was issued on June 30, 2020, and Aldini first learned of it, the judgment did not state whether there was a buyer already or, if so, who the buyer was. The judgment did not mention Silvaco.

251. The judgment stated that without the permission for a sale there was a real risk of closure of the Dolphin Design business with concomitant loss of employment.

252. Despite the MBDA and Soitec Defendants' earlier assurances and statements to the bankruptcy court that MBDA/Soitec would continue Dolphin Integration's business under the name Dolphin Design, on information and belief, MBDA/Soitec now argued that such was impossible without selling the non-defense assets – Dolphin Integration's memory compiler technology and standard cell libraries.

253. Both the Dolphin Integration trustee and the Public Prosecutor advised the bankruptcy court against lifting the injunction on the basis that the judgment approving the pre-pack offer and ordering the asset transfer was not final because it was still under judicial review on appeal, and the asset transfer agreement itself, also, was being challenged legally by Aldini.

254. All that Aldini learned from the June 30, 2020, judgment was that the court had authorized a sale of the Dolphin Integration memory compiler technology and standard cell libraries and all related tangible and intangible assets. Whether there was a buyer already or, if so, who it was remained unclear.

**Aldini Tried to Uncover the Facts**

255. Aldini filed the following disclosure actions in order to try and unearth the facts to substantiate its suspicion that there might be more behind the MBDA/Soitec pre-pack transaction and proceeding than the purported continuation of Dolphin Integration's business, albeit under the name Dolphin Design: (i) a disclosure action against Defendant MBDA before the Commercial Court in Nanterre (France), (ii) a disclosure action against Defendants Sapin and A.J. Partenaires

1  (the bankruptcy trustees) before the Court in Lyons (France), and (iii) a disclosure motion against

2  Defendants Soitec and Dolphin Design before the Commercial Court in Grenoble (France).

3      256.   MBDA not only resisted having to itself disclose the facts, MBDA also intervened

4  in the other disclosure requests to object and, on information and belief, to prevent Aldini from

5  learning about the conspiracy between the Republic of France, Ministère des Armées, DGA and

6  MBDA to '*de-ITAR-ize*' its products to best the United States arms industry's competition, and to

7  create a beachhead for Soitec in the U.S. microprocessor industry.

8      257.   Hence, Aldini was unable to discover the Republic of France's, Ministère des

9  Armées', DGA's and the MBDA, Soitec, and Silvaco defendants' fraudulent and illegal scheme

10  to make off with the Dolphin Integration assets and IP and to commit fraud on the bankruptcy

11  court to avoid a public sale because the Defendants were hiding the facts and fiercely resisted

12  Aldini's attempts to discover the facts.

13      258.   As a result, the courts of first instance denied Aldini's disclosure motions.  Aldini

14  has appealed all those decisions and those appeals are currently pending.

15      259.   Defendants MBDA and Soitec are vehemently fighting Aldini's efforts to get

16  disclosure and to unearth the facts of their and the other Defendants' wrongdoing.

17      260.   As a result, in denying Aldini's appeal against the denial of its disclosure motion

18  against MBDA, the Versailles Court of Appeal held that Aldini must first demonstrate "the

19  existence of precise elements constituting indications of a possible violation of a rule of law

20  making it possible to establish the plausibility of the facts the evidence of which may be

21  necessary in the context of a possible trial on the merits."

22      261.   Thus, the Versailles Court of Appeal in denying the disclosure motion held that

23  Aldini had failed the establish the very evidence of fraud for which it was seeking disclosure.

24  Aldini's appeal to the French Supreme Court is pending.

25      262.   Aldini also filed various formal requests with the bankruptcy court over the years

26  to obtain the documents filed in connection with and transcripts of the pre-pack proceeding, as

27  well as a copy of the July 6, 2018, initial pre-pack offer.

28      263.   All Aldini's requests were denied.

264.   Aldini did everything it reasonably could to discover what transpired, but its efforts were rebuffed time and again, and it was denied information concerning what had happened with the Dolphin Integration assets, IP, and trade secrets.

265.   On April 16, 2019, MBDA defied a court order allowing a search of its premises when it refused entry to its headquarters by the bailiff and the French police trying to execute the search ordered by the court at Aldini's request.  A three-hours long stand-off ensued before the bailiff gave up and, on information and belief, MBDA's personnel narrowly escaped being arrested by the police, as the court had authorized the bailiff to instruct the police to arrest "those necessary for the fulfillment of the mission" and for "all Commanders and Officers of the Police to lend the strong arm of the law."

266.   On information and belief, when as a result of MBDA's, Soitec's, and Dolphin Design's fraud on the court the judgment approving the lifting of the injunction on the sale of the Dolphin Integration assets and IP was issued on June 30, 2020, Aldini first learned that Dolphin Integration assets and IP might be sold, but not when or to whom.  The judgment did not disclose whether there was a buyer already or, if so, who the buyer was or what price had been agreed and on what terms or why.

267.   The judgment did state that without Dolphin Integration's memory compiler technology and standard cell libraries and all related tangible and intangible assets being sold, there was a real risk of closure of the business and redundancies.

268.   The fact that without a part of Dolphin Integration's non-defense assets the company was no longer viable and could not survive, revealed for the first time that Dolphin Integration's business was not being continued under the name Dolphin Design, but that, in fact, the defense and non-defense assets, IP, and trade secrets had been stripped out and had disappeared.

269.   The statement in the judgment that without Dolphin Integration's memory compiler technology and standard cell libraries there was a real risk of closure of the business also was the first indication that Dolphin Integration's other non-defense and the defense assets, IP, and related trade secrets were gone.

270. Aldini still did not know whether and, if so, where and to whom the Dolphin Integration defense and non-defense assets, other than its memory compiler technology and standard cell libraries, were going to be transferred, when, or on what basis.

271. It thus became clear for the first time on June 30, 2020, that even if Aldini would prevail in its various French legal actions in the bankruptcy proceedings objecting to the secret pre-pack offer approval and to the asset transfer agreement, that Aldini might permanently be deprived of an opportunity to ever bid for the Dolphin Integration assets and IP because they might be sold soon or were sold and gone already, and that Aldini's strategic equity stake would be permanently destroyed if that were to happen.

272. On information and belief, MBDA's and Soitec's efforts to block Aldini from uncovering the facts are undertaken in coordination with and with the approval and at the behest of Defendants the Republic of France, Ministère des Armées, DGA, and Kammerer, who are attempting to hide their involvement and role in the conspiracy to drive stock exchange listed company Dolphin Integration into bankruptcy and to seize its assets, IP, and trade secrets in order to promote MBDA's foreign arms sales by '*de-ITAR-izing*' its products so as part of its plan to make the French defense industry immune to the United States-imposed restrictions on international arms sales.

**Silvaco's Announcement Reveals the Hitherto Secret Scheme**

273. On November 12, 2020, Silvaco announced that it had acquired Dolphin Integration's "memory compiler technology and standard cell libraries of Dolphin Design," thereby revealing itself to be the mystery buyer of part of the Dolphin Integration assets.

274. On information and belief, on Friday, November 13, 2020, the Silvaco transaction was first reported in the press and appeared in the "Week In Review" section of the SemiconductorEngineering web-publication.

275. The announcement came to Aldini's attention on Sunday, November 15, 2020, at 4:04 p.m. local time in Switzerland.

276. It was at this point that Aldini first learned that the permission for a sale of Dolphin Integration assets in the June 30, 2020, judgment had indeed led to an actual sale.

277.   The January 9-10, 2021, edition of the official French Government gazette (known by the acronym "BODACC") published the transaction and revealed that the price reportedly paid for Dolphin Integration's memory compiler technology and standard cell libraries was €1,140,000

278.   If without memory compiler technology and standard cell libraries, valued apparently at only €1,140,000, the business that had recently had a market cap of €51,000,000 was no longer deemed viable – the June 30, 2020, judgment had mentioned that there was a real risk of closure of the business without it – Aldini realized that the other defense and non-defense assets must have already been stripped and had disappeared, too.

279.   Hence, it became clear for the first time that far from continuing Dolphin Integration's business with all its assets and IP under the name Dolphin Design, the company had secretly been stripped bare.

280.   The only still identifiable assets, IP, and trade secrets – the memory compiler technology and standard cell libraries – had been carted off to California and were now beyond the reach of the French courts or anyone objecting there.

281.   The revelation also shed new light on Bouvier's admissions that MBDA, in cooperation with DGA, had secured the defense-related assets to protect French sovereignty.  For it now became clear that those assets and the defense-related IP, too, on information and belief, were no longer held by Dolphin Design pending a decision on the validity of the asset transfer agreement, but that they, too, had disappeared.

282.   Aldini did not learn of the Defendants' scheme and conspiracy, until Aldini learned that the Dolphin Integration assets, IP, and trade secrets were gone, transferred to Silvaco and, as far as the defense assets and IP were concerned, to an unknown place but presumably within the control of MBDA.

283.   In addition to trying to unearth the facts in France, albeit in vain so far, Aldini also pursued discovery in aid of its efforts in France, pursuant to 28 U.S.C. §1782, against Silvaco in California.

284.   On July 21, 2021, the Honorable Nathanael M. Cousins, United States Magistrate Judge for the United States District Court for the Northern District of California granted Aldini

1   permission to serve a subpoena on Silvaco seeking document discovery pursuant to 28 U.S.C.

2   §1782 in aid of Aldini's French proceedings.

3        285.    However, in a further effort to prevent Aldini from discovering the facts, MBDA

4   and Soitec on informed Aldini on August 12, 2021, that they will be submitting themselves to the

5   jurisdiction in California and will seek to intervene as third parties in that 28 U.S.C. §1782

6   proceeding to object to the Court's decision permitting Aldini to obtain such discovery, and will

7   try to quash the subpoena served on Silvaco with, on information and belief, the aim to prevent

8   Aldini from bringing to light any additional facts concerning the Defendants' conspiracy.

9                      **Silvaco's Guilty Conscience and *Mens Rea***

10       286.    On information and belief, Silvaco, Pesic, and Taheri were aware that Aldini had

11   brough suit before the Commercial Court in Grenoble (*Tribunal de commerce de Grenoble*) not

12   only against MBDA and Soitec, but also against Dolphin Design from whom Silvaco acquired the

13   Dolphin Integration business, assets, and IP, to nullify and to obtain a judgment declaring the

14   transfer of those assets and IP to MBDA, Soitec, and/or Dolphin Design null and void.

15       287.    On information and belief, Silvaco, Pesic, and Taheri knew that in that proceeding

16   Aldini had asked the court to declare the July 6 and 13, 2018, MBDA/Soitec pre-pack offers for

17   Dolphin Integration's assets and IP fraudulent and in violation of French law on the basis that

18   they were against public order and violated the prohibition against insider dealing by MBDA and

19   Soitec found in Art. L642-3 of the French Commercial Code.

20       288.    On information and belief, as a result, Silvaco, Pesic, and Taheri knew that

21   Dolphin Integration's assets, IP, and trade secrets that Silvaco acquired from Dolphin Design had

22   been acquired through the MBDA/Soitec pre-pack offers and subsequently transferred to Dolphin

23   Design.

24       289.    On information and belief, Silvaco, Pesic, and Taheri knew that Dolphin Design's

25   assets and IP were contested and subject to legal proceedings in France, and Silvaco, Pesic, and

26   Taheri purposefully cooperated and assisted in those assets and IP being transferred to the United

27   States, where they are beyond the reach of the French courts.

28

290.   On information and belief, the MBDA and Soitec defendants all along had the objective to sell and transfer the Dolphin Integration assets and IP, the memory compiler technology and standard cell libraries, to Silvaco in California.

291.   On information and belief, that transaction is a sale in name only in that Soitec is working together with Silvaco to monetize that technology even today.

292.   Carlos Mazure, Executive Vice-President of Soitec, joined the Silvaco Board of Directors a mere four months before this transaction was announced publicly.

293.   Various statements made by Silvaco executives to the press, show that Mr. Mazure plays a coordinating role.

294.   As reported on BusinessWire on July 23, 2020, Iliya Pesic, Executive Chairman of the Silvaco Board stated that Mr. Mazure "has an extremely impressive track record . . . orchestrating the integration of industries along the value chain . . . a tremendous asset to Silvaco as we continue to grow our business".

295.   Silvaco's CEO, Babak Taheri, in the same interview added: "I have known Carlos for several years . . . I look forward to our close collaboration on Silvaco's strategic planning".

296.   Mr. Mazure is not simply a Soitec official to 'keep watch' over Silvaco's monetization of the Dolphin Integration assets, he is a highly experienced scientist with an in-depth understanding of semiconductor technology and more than 100 patents filed worldwide, who has reportedly authored over 120 scientific papers.

297.   On information and belief, the transfer of the Dolphin Integration memory compiler technology and standard cell libraries to Silvaco in California was an integral part of MBDA Inc.'s, MBDA's, Ministère des Armées', DGA's, the Republic of France's, Soitec USA's, Soitec's, and Silvaco's illegal scheme and conspiracy to strip Dolphin Integration's assets and IP, to misappropriate its trade secrets, and to destroy the company so that non-French parties, such as Aldini, could not acquire the same.

298.   On information and belief, these Defendants used Messrs. Beriot and Van den Bossche's violations of law, including breaching their duty of loyalty and duty of confidentiality as director's representative or director of Dolphin Integration, to obtain confidential and sensitive

1  inside company information and trade secrets from Dolphin Integration, a publicly listed

2  company, to advance the Defendants' plan to strip the company of its assets, IP, and trade secrets.

3       299.    On information and belief, Silvaco, Pesic, and Taheri were aware of the same.

4       300.    On information and belief, Defendants the Republic of France, Ministère des

5  Armées, DGA, MBDA, Bouvier, Berger, and Van den Bossche authorized, approved, and

6  cooperated with the part of the plan through which the Soitec defendants and Silvaco, Pesic, and

7  Taheri spirited away the non-defense related Dolphin Integration assets and IP to California, to

8  afford Soitec, a leading French technology company, access to the California and Unites States

9  microprocessor market.

10       301.    On information and belief, the Republic of France, Ministère des Armées, DGA,

11  MBDA, Bouvier, Berger, and Van den Bossche aimed their behavior at facilitating the California-

12  aspects of the plan because it ensured Soitec's crucial cooperation with their plan to prevent

13  Dolphin Integration's defense assets and IP from falling into foreign, non-French hands, and to

14  prevent the United States from blocking French foreign arms sales by invoking the United States'

15  ITAR regulations.

16       302.    On information and belief, as set out in detail in this Complaint, Defendants

17  MBDA, MBDA Inc., Bouvier, Berger, Republic of France, DGA, and Kammerer agreed and

18  worked together with Defendants Soitec USA, Soitec, Depeyrot, Dupont, Sommelet, Boudre, and

19  Silvaco to ensure that the non-defense related Dolphin Integration assets and IP would be sold

20  and transferred to California in order to ensure that Soitec would gain access to the United States

21  semiconductor and microprocessor market.

22       303.    Defendants Bouvier, Berger, Depeyrot, Dupont, Sommelet, Boudre, Pesic, Taheri,

23  and Kammerer, as alleged in detail in this Complaint, were not mere employees, but they were

24  primary participants in directing the conspiracy and carrying out the tortious conduct.

25       304.    The Defendants are put on notice pursuant to Rule 44.1 of the Federal Rules of

26  Civil Procedure that foreign law may apply to one or more of the following causes of action.

27

28

## FIRST CAUSE OF ACTION

## FOR INTENTIONAL INTERFERENCE WITH A PROSPECTIVE ECONOMIC ADVANTAGE

### (Against All Defendants)

305.    Plaintiff reasserts and realleges, as if fully incorporated here, the allegations set forth above.

306.    On information and belief, Defendants through their tortious and independently wrongful behavior described in detail in this Complaint, prevented Aldini from acquiring Dolphin Integration and its assets and IP, including through the Defendants' fraud perpetrated on the bankruptcy court, and by Defendants' preventing the business, assets, and IP of Dolphin Integration from becoming part of and being offered in a regular bankruptcy tender and sale during which the bankruptcy court has an obligation to sell such assets at the highest available price, and where it would have been reasonably probable that Aldini would have been either the sole or prevailing bidder.

307.    On information and belief, the Defendants knew of the existence of that relationship between bidders and Dolphin Integration, its assets, and the court, in a bankruptcy sale because that is what happens in the regular course of events in any bankruptcy proceeding, and would have happened here, but for Defendants' intentional tortious interference because of which there was no public bankruptcy sale, and as a result of which Aldini suffered damages as set forth in this Complaint.

308.    On information and belief, the Defendants acted with an improper motive and through independently unlawful means to deprive Aldini of a reasonably probable economic expectancy.

309.    On information and belief, Defendants Van den Bossche and Beriot as board members or board member representatives at Dolphin Integration, and Defendants Depeyrot and Dupont as corporate officers of Dolphin Integration breached their duty of confidentiality by providing, on information and belief, confidential and sensitive company information to the MBDA and Soitec defendants and to Silvaco, Silvaco France, the Republic of France, Ministère

des Armées, DGA, Kammerer, Bouvier, Berger, Sommelet, Boudre, Pesic, and Taheri, with which MBDA and Soitec were able to put together their July 6 and 13, 2018, pre-pack take-over offers and to acquire the assets and IP in secret.

310.   On information and belief, by doing so, Defendants Van den Bossche, Beriot, Depeyrot, and Dupont acted illegally, including because they violated their legal duty of confidentiality found in Art. L. 225-37 of the French Commercial Code applicable to them as board members/board member representatives and officers of Dolphin Integration.

311.   Art. 226-13 of the French Criminal Code states: "The revelation of information of a secret nature by a person who is the custodian of it either by state or profession, or because of a function or a temporary mission, is punishable by one year of imprisonment and a €15,000 fine."

312.   On information and belief, the same Defendants also acted illegally because they breached their duty of loyalty, including to Dolphin Integration's shareholders, including Aldini, as it exists under French law, and which demands, also, a duty of transparency and information towards the shareholders and obligation to treat them equally.

313.   In particular, the duty of loyalty prohibits Defendants from setting up a competing company or promoting competing interests.

314.   On information and belief, the MBDA and Soitec defendants, Silvaco, the Republic of France, Ministère des Armées, DGA, Kammerer, Bouvier, Berger, Sommelet, Boudre, Pesic, and Taheri aided and abetted, enticed, caused, and encouraged Van den Bossche and Beriot, who were employees of MBDA and Soitec, respectively, and Depeyrot and Dupont to breach their statutory duty of confidentiality and duty of loyalty as board members and corporate officers of Dolphin Integration.

315.   In particular, on information and belief, the MBDA and Soitec defendants, the Republic of France, Ministère des Armées, DGA, Kammerer, Bouvier, Sommelet and Boudre enlisted the Dolphin Integration board members Van den Bossche and Beriot and management, Depeyrot and Dupont, in their common plan to drive Dolphin Integration, a publicly listed company, into bankruptcy in order to strip the company's business, assets, and IP and preventing others from being able to bid for the same, as set out in detail in this Complaint, by not taking any

action to raise additional capital or bank financing, and by turning down offers of financial assistance from various shareholders, including Groupe David Gerbier, CLEG Mobilités-Gerbier, and Mr. Boutin.

316.    In particular, on information and belief, the MBDA and Soitec defendants, the Republic of France, Ministère des Armées, DGA, Kammerer, Bouvier, Berger, Sommelet and Boudre enlisted the Dolphin Integration board members Van den Bossche and Beriot and management, Depeyrot and Dupont in their common plan to asset strip Dolphin Integration, so that MBDA and Soitec could keep that IP and those assets and use them in their own products, by hiding Dolphin Integration's true financial situation and the fact that its business, assets, and IP were being sold, and by causing those Dolphin Integration board members and management to issue misleading Press Releases containing misrepresentations as to material facts as set out in detail in this Complaint.

317.    On information and belief, these actions aided and abetted by the Republic of France, Ministère des Armées, and DGA undertaken at their instigation and under their instructions is the type of behavior by which a private party engages in trade and traffic or commerce notwithstanding that the precise undertakings were illegal.

318.    On information and belief, what the Republic of France, Ministère des Armées, and DGA did, is what commercial actors engage in despite that, in this instance, it violated French law: obtaining assets, IP, and trade secrets for use in Defendants' products to best the (foreign) competition and defeat or circumvent international restrictions on trade in their products.

319.    That the Republic of France, Ministère des Armées, and DGA, on information and belief, used the MBDA and Soitec defendants, commercial business enterprises and executives, to carry out the common plan to strip and destroy Dolphin Integration shows that this is behavior that private parties can engage in rather than an exercise of police powers or peculiarly sovereign conduct typically reserved for and the exclusive preserve of state actors.

320.    On information and belief, the Republic of France, Ministère des Armées, and DGA, together with the other Defendants, made commercial use of the assets and IP they stripped from Dolphin Integration.

321.    This action is based upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere, in accordance with the second clause of 28 U.S.C. 1605(a)(2), because the alleged conduct of Silvaco, Pesic, Taheri, Soitec USA, and Soitec in California took place in connection with the commercial activities by the Republic of France, Ministère des Armées, and DGA elsewhere (*i.e.*, in France) set out in detail in this Complaint that were part of the plan to drive Dolphin Integration into bankruptcy and to asset strip it so as to enable MBDA to avoid restrictions on its international arms sale and to provide Soitec with a commercial and competitive advantage in expanding into the United States semiconductor and microprocessor market through its joint venture and cooperation with Silvaco.

322.    In addition, this action is based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States, in accordance with the third clause of 28 U.S.C. 1605(a)(2), because the alleged conduct of the Defendants outside the United States (*i.e.*, in France) in connection with the commercial activities by the Republic of France, Ministère des Armées, and DGA elsewhere (*i.e.*, in France) set out in detail in this Complaint, that were part of the plan drive Dolphin Integration into bankruptcy and to asset strip it so as to enable MBDA to avoid restrictions on its international arms sale, and to provide Soitec and Soitec USA with a commercial and competitive advantage in expanding into the United States technology market through their joint venture and cooperation with Silvaco, caused a direct effect in the United States because the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems, including both California and France, as alleged in this Complaint.

323.    Aldini incorporates by reference as if fully set out here, the other bases for jurisdiction over the Republic of France, Ministère des Armées, and DGA alleged elsewhere in this Complaint.

324.    Aldini relied on the aforementioned Press Releases, including those that said that Dolphin Integration was working to emerge as a going concern and that there would be a half-year observation period until mid-January 2019, and that a data room would be made available if and when Dolphin Integration's business, assets, and IP would be sold.

325.    The Defendants' intentional misleading material misrepresentations constitute an independent wrongful act because under California law, intentional misrepresentation is a type of deceit under Cal. Civil Code §§ 1709,1710 and the same applies under French law.

326.    Aldini suffered damages as a result because it was prevented from taking action or bidding on the Dolphin Integration assets during a public bankruptcy tender and sale where it would have been reasonably probable that it would have been the only or prevailing bidder.

327.    In particular, on information and belief, Defendants Van den Bossche and Beriot, in providing confidential and sensitive Dolphin Integration company information and trade secrets to the MBDA and Soitec defendants, Bouvier, Berger, Sommelet and Boudre, and indirectly to the Republic of France, Ministère des Armées, DGA, and Kammerer, in order to enable them to drive Dolphin Integration into bankruptcy and to asset strip it, acted in violation of French law that forbids such conflicts of interest.

328.    The breaches of duty and violations of law set out here apply with particular force to a publicly listed company such as was Dolphin Integration, and the Defendants' conduct therefore violated French law in relation to listed companies.

329.    On information and belief, Defendants MBDA, Soitec, Van den Bossche, Beriot, as members of the Dolphin Integration board of directors, and Depeyrot and Dupont, as the company's President and CEO, respectively, acted illegally and violated applicable European regulations pertaining to publicly listed companies because those regulations hold that stock-exchange listed companies must make public without delay any information concerning them that is likely to have an influence on the price of their securities, while the Defendants deceitfully issued misleading Press Releases as set out in detail in this Complaint, hiding Dolphin Integration's true situation in furtherance of the Defendants' common plan to drive Dolphin Integration into bankruptcy and to strip the company of its assets and IP.

330.    The Defendants' duty to disclose includes EU Regulation No. 596/2014 of April 16, 2014 (*i.e.*, the multilateral trading facility regulation, also known as the MAR-regulation) and its French implementing regulations.  This regulation being of direct application, is binding on all companies whose financial instruments are listed on Euronext Paris, Alternext now, Euronext Growth, and the Free Market, such as was the case for Dolphin Integration.

331.    On information and belief, Defendants' MBDA, Soitec, Van den Bossche, Beriot as members of the Dolphin Integration board of directors, and Depeyrot and Dupont, as the company's President and CEO, respectively, conduct is further independently wrongful and illegal because they violated the legislation on market abuse (EU Reg. No. 596/2014 of the European Parliament and of the Council of April 16, 2014), sanctioning, in particular the dissemination of false or misleading information, characterized by Defendants' willfully omitting material data or knowingly reporting inaccurate information for the purpose of misleading the public.

332.    On information and belief, the Defendants as managers and in charge of a publicly listed company, such as Dolphin Integration, did not comply with its obligations with regard to the publication of inside information and may be penalized, also, on the basis of article 221-1 of the so-called French Reg-AMF, *i.e.*, Regulations of the French Financial Markets Regulator (*Autorité des Marchés Financiers*) making their conduct through which they interfered with Aldini's prospective economic advantage independently wrongful.

333.    Breaches of market transparency are also independently wrongful and punishable the French Monetary and Financial Code (*Code monétaire et financier*).

334.    Thus, the dissemination by any means of information which gives false or misleading indications on the situation or the prospects of Dolphin Integration, such as, on information and belief, by Defendants Van den Bossche, Beriot, Depeyrot, and Dupont as set out in detail in this Complaint is further independently wrongful and illegal because it is punishable by five years of imprisonment and a fine of up to €100 million (approximately $118,000,000) while the amount may be increased up to ten times to match the amount of the advantage obtained

from the offense (*Code monétaire et financier*, Art. L. 465-3-2 I by reference to Art. L. 465 -1 IA).

335.    An attempt to commit the offense is punishable by the same penalties (*Code monétaire et financier*, Article L465-3-2 II), and when the offense is committed in organized association with others, the prison sentence is increased to ten years (Art. L 465-3-5).

336.    The breaches of duty and violations, including the collection, use, or disclosure of Dolphin Integration company information as described in this Complaint, also constitute illegal behavior under French law insofar as they amount to a breach of trade secrets, and thus the Defendants' conduct is illegal by virtue of Art. L. 151-1 *et seq.* of the French Commercial Code.

337.    On information and belief, Defendants Silvaco, Pesic, and Taheri participated in these violations of law and the illegal conduct, aided and abetted, and benefited from the same because they were the designated and intended recipients in California of a not insignificant part of the Dolphin Integration non-defense related assets, in particular Dolphin Integration's memory compiler technology and standard cell libraries.

338.    On information and belief, Defendants the MBDA and Soitec defendants, Silvaco, the Republic of France, Ministère des Armées, DGA, Kammerer, Bouvier, Berger, Sommelet, Boudre, Pesic, and Taheri enticed, caused, and encouraged Defendants Van den Bossche and Beriot, who besides being on the board of Dolphin Integration were employees of MBDA and Soitec, respectively, and Defendants Depeyrot, and Dupont, to breach the applicable MAR and other EU regulations, and trade secret protection as set out in this Complaint, so as to further the Defendants' common plan to drive Dolphin Integration into bankruptcy and to strip the company of its assets and IP in order to prevent it from falling into non-French hands.

339.    Defendants' purpose was to strip Dolphin Integration of its business, all its assets, and IP and to destroy Dolphin Integration as set out in detail in this Complaint, by acquiring that business, assets and IP while preventing Aldini and others from being able to bid for the same.

340.    Defendant MBDA and Bouvier who, on information and belief, were acting on the instruction and behest of Defendants the Republic of France, Ministère des Armées, DGA, and Kammerer, publicly admitted the same, as set out in detail in this Complaint.

341.   Defendants' conduct was illegal, as well as innately wrongful, and predatory in nature, as set out in detail in this Complaint.

342.   It is reasonably probable that Aldini would have been the prevailing bidder and that it would have realized the economic advantage but for the Defendants' interference.

343.   Besides the Defendants, who chose to prevent and thus avoid a public bankruptcy sale of Dolphin Integration's assets and who thus would not be bidders – and who in any event, as directors and insiders, would not have been allowed to bid pursuant to Art. L. 642-3 of the French Commercial Code – only three other parties showed an interest in the Dolphin Integration assets and IP besides Aldini: Mr. Boutin, Groupe David Gerbier, and CLEG Mobilités-Gerbier.  The latter two, on information and belief, are owned by one and the same individual.

344.   Mr. Boutin and CLEG Mobilités-Gerbier did not pursue their nascent interest in the Dolphin Integration assets and IP once the pre-pack offers had been accepted by bankruptcy court.  Neither challenged that judgment.  Mr. Gerbier and Aldini did.

345.   Unlike Aldini, Groupe David Gerbier only challenged the bankruptcy court judgment approving the pre-pack offers but did not challenge or seek to void the actual transfer agreement by which MBDA/Soitec acquired and transferred those assets and IP from Dolphin Integration to the SPV Dolphin Design.

346.   Mr. Gerbier's action was rejected on appeal, and he did not pursue it further.

347.   Aldini did challenge both the bankruptcy court judgment, obtained by a fraud on the court and without due process, as well as the asset transfer agreement.

348.   In addition to those legal proceedings, Aldini instigated various separate legal proceedings in France to obtain information regarding the pre-pack sale.

349.   Aldini challenged the validity of several of the statutory provisions at issue through a special administrative appeal to the Prime Minister of the Republic of France, a case it pursued on appeal as well.

350.   Unaware of the Defendants' conspiracy and common plan and having challenged the approval of the pre-pack offers and the validity of MBDA/Soitec/Dolphin Design's asset

1   transfer agreement, Aldini made an offer to the Dolphin Integration trustee Christophe Roumezi

2   to acquire the company, its assets, and IP, to turn Dolphin Integration around.

3       351.    Aldini's legal representative wrote to Mr. Roumezi on September 20, 2019,

4   conveying Aldini's offer of a convertible loan to Dolphin Integration to pay its creditors

5   accompanied by a proposal to acquire the company and to buy back Dolphin Integration's assets.

6       352.    Aldini's legal representative again wrote to Mr. Roumezi on December 4, 2019,

7   forwarding Aldini's written offer of a convertible loan to Dolphin Integration to pay its creditors

8   accompanied by a proposal to acquire the company and to buy back Dolphin Integration's assets.

9       353.    In its offer, Aldini explained that it was "greatly concerned about the several

10  creditors and employees (who own 10% of the company) that are being left with no suitable

11  course of action following the MBDA / Soitec proposal," and Aldini explained that "[i]f the

12  company is liquidated today, the creditors will simply lose everything.  Among the creditors we

13  are aware of employees, banks, public institutions, service providers mainly local SMEs, and a

14  great number of other stakeholders will have no solution at all.  That is the reason why, as part of

15  our solution, we believe Aldini has got the right capital, expertise and capabilities required to

16  avoid this disaster for creditors."

17      354.    Aldini's further offer stated: "Aldini is interested in offering a plan to finance

18  Dolphin Integration and allow the company to turn its destiny around.  Aldini and its Senior

19  Management have the conviction that the company is resilient and its expertise invaluable.  In

20  other words, the plan proposed by MBDA and Soitec to Tribunal de Commerce de Grenoble

21  clearly undervalues the company, its assets and its potential while destroying shareholder's value.

22  Aldini's purpose is to acquire the company and the underlying assets.  The objective is to offer

23  Dolphin Integration a convertible loan in order to restructure and repay all outstanding debts.  It

24  will help avoid a disaster for the current creditors and employees . . . Aldini['s] . . . offer to

25  Dolphin Integration . . . will be far superior to that of MBDA and Soitec.  Aldini will ensure to

26  give the assets the optimal strategic plan and know-how to thrive . . . Aldini is uniquely

27  positioned to appoint a new Management Team to manage Dolphin Integration not only by

28

strengthening its financial controlling and procedures but also by leveraging its international industrial and commercial network to support growing revenue."

355.     However, because the data room and information that Dolphin Integration had promised to make available in its, as it turned out misleading, Press Release on July 26, 2018, had never materialized, Aldini asked Mr. Roumezi to provide "access to Dolphin Integration's last audited financials (FY2018) . . . access to sufficient further accurate, clear and complete information as well as corroborative documentation about the business, the client relations and the latest contracts entered by the company . . . Access the latest updates on the assets since the transition with Dolphin Design was initiated . . . for a due diligence workshop to be held for Aldini to examine management, account records and bank statements."

356.     On information and belief, Aldini was denied access to the requested information and its offer was ignored because MBDA and Soitec, as part of their conspiracy and common plan with the other Defendants to asset strip and destroy Dolphin Integration, prevented Aldini from gaining access to the information and prevented or convinced the trustee not to respond to Aldini's offer.

357.     On information and belief, no other legitimate potential bidders materialized, nor did Mr. Boutin, Groupe David Gerbier or CLEG Mobilités-Gerbier ever make an offer, and Aldini was the only legitimate bidder for Dolphin Integration, its assets, and IP.

358.     Hence, it is reasonably probable that Aldini due to its commitment and dedication would prevail as the bidder for the Dolphin Integration business, assets, and IP had they been offered in a public bankruptcy sale, which would have been the case but for the Defendants' tortious and unlawful interference.

359.     Likewise, it is reasonably probable that Aldini's superior offer on December 4, 2019, would have been accepted by the trustee, whose purpose is to maximize the assets and return for Dolphin Integration's creditors, but for the Defendants' tortious and unlawful interference.

360.   Even had Groupe David Gerbier continued to pursue Dolphin Integration's assets and IP further, and if it would have been another bidder at a public bankruptcy sale, it is unlikely to have prevailed over Aldini.

361.   Aldini is a well-established merchant banking firm with a long-financial track record, it has extensive business experience with corporate finance and mergers and acquisition, and it and its affiliates have more than US$3 billion under management and invests in excess of €100 million per year in small/medium sized enterprises and publicly quoted companies.

362.   In contrast, Groupe David Gerbier consists of car dealership concessions and deals in secondhand cars.  CLEG Mobilités-Gerbier is a company dealing in machinery, boats, and equipment.  While respectable and, on their face, successful businesses – on information and belief, owned by a single individual – their core business is not corporate finance or merger and acquisitions, and presumably the companies' financial profile does not rise to anywhere near the size of a Swiss merchant banking firm with a long-established track record in the field, such as Aldini.

363.   Aldini's financial expertise and hitting power would have been further augmented by its client-base who would have been offered an opportunity to participate when necessary to win such a bidding contest.

364.   The same applies *ipso facto* to Mr. Boutin, who showed less commitment and interest than Mr. Gerbier through his two companies Groupe David Gerbier and CLEG Mobilités-Gerbier.

365.   Aldini's willingness and ability to outbid the other potential bidders that might have shown up, if any, and who may have participated in a public bankruptcy sale of the Dolphin Integration assets and IP is beyond doubt as Aldini had valued Dolphin Integration to be worth more than €649,000,000.

366.   On October 22, 2018, Aldini was told by one of Dolphin Integration's co-founders, and major shareholder Jean-François Pollet, that he and Louis Zangara, another co-founder, would support Aldini's bid for Dolphin Integration, its assets, and IP.

367.    On October 27, 2018, Aldini was contacted by Gilles Depeyrot – son of the company's co-founder and President Michel Depeyrot – who had been Dolphin Integration's CEO from September 2015 until May 2017, and the company's Chief Technology Officer from June 2011 until May 2018, and who promised to support Aldini's bid to acquire Dolphin Integration, its assets, and IP.

368.    Aldini was the only legitimate buyer that in fact made an offer, when on December 4, 2019, it made an offer to the trustee Mr. Roumezi to acquire Dolphin Integration, its assets, and IP.

369.    On information and belief, the Defendants and in particular Defendants MBDA, Bouvier, the French Republic, Ministère des Armées, DGA, and Kammerer too, believed that Aldini as a foreign non-French corporation would have been the bidder that was reasonably probable to prevail.  After all, their motive to prevent such a public bankruptcy sale, and to strip Dolphin Integration of its assets and IP, was in the words of Bouvier "to avoid the takeover of this business by potentially non-European, hostile players" and, as Bouvier further stated, also "to avoid the resumption of this activity by potentially hostile non-European actors."

370.    This was Bouvier's stated reason why MBDA and he had "acted with the DGA" to, on information and belief, asset strip and destroy Dolphin Integration.

371.    On information and belief, this was the same motive that led MBDA and Soitec to interfere with Aldini's offer to the trustee on December 4, 2019.

372.    Hence the Defendants intended to interfere with Aldini's prospective economic advantage or the Defendants knew that the interference was certain or substantially certain to occur as a result of their actions.

373.    Defendants knew they were interfering with the prospective economic advantage of the party reasonably probable to prevail as the bidder in a public bankruptcy sale or in a transaction with the trustee because it was the Defendants' purpose through their unlawful and tortious conduct, as set out in detail in this Complaint, to prevent that sale from taking place.

374.    On information and belief, Mr. Boutin, Groupe David Gerbier, and CLEG Mobilités-Gerbier are all French.

375.    Insofar as the Defendants may have had a multiplicity or foreign bidders in mind when it prevented a public bankruptcy sale, it is irrelevant.  It is a fact that no other foreign parties, besides Aldini, have shown an interest in opposing the Defendants' asset stripping and destruction of Dolphin Integration or pursuing its assets and IP.

376.    Aldini would have been the most qualified, if not the only qualified bidder, had Defendants' unlawful conduct and fraud perpetrated on the bankruptcy court, and resulting interference, not led to a secret pre-pack sale but instead there would have been a regular public bankruptcy sale.

377.    On information and belief, Aldini was the sole bidder when it approached the trustee Mr. Roumezi with an offer that was superior to the MBDA/Soitec pre-pack offer.

378.    As a result of the Defendants' wrongful conduct and interference with Aldini's prospective economic advantage, Aldini suffered damages from being deprived of Dolphin Integration and its assets and IP which Aldini had valued at €649,000,000.

379.    The resulting damages were proximately caused by the Defendants' wrongful conduct as alleged in detail in this Complaint with the amount to be determined at trial.

380.    Defendants' conduct was knowing, willful, intentional or deliberate wrongdoing, malicious, oppressive, and reprehensible and carried out with an evil motive, or a conscious act that willfully and wantonly disregarded Aldini's rights, intended to cause and that, in fact, did cause Aldini to suffer harm.  As a result, Aldini is entitled to punitive damages in an amount to be determined at trial appropriate to deter further such conduct.

**SECOND CAUSE OF ACTION**

**FOR TAKING AND EXPROPRIATION IN VIOLATION OF INTERNATIONAL LAW**

**(Against Defendants the Republic of France, Ministère des Armées, DGA, Kammerer)**

381.    Plaintiff reasserts and realleges, as if fully incorporated here, the allegations set forth above.

382.    Bouvier, then President of MBDA publicly admitted that "we acted quickly, we acted with partners, we have acted with the DGA" when MBDA and he stripped Dolphin Integration of all its assets and destroyed that company, thereby (i) depriving Aldini of its

business expectation and prospective economic advantage, (ii) destroying Aldini's strategic equity stake consisting of 28,466 Dolphin Integration shares amounting to an equity position of 2.12% in Dolphin Integration, and (iii) causing Aldini loss for which it is entitled to compensation.

383.   On information and belief, those actions were undertaken at the behest of and under instruction from and by Defendants the Republic of France, Ministère des Armées, DGA, and Kammerer because they wished to avoid the takeover of Dolphin Integration by non-French entities and/or bidders to safeguard and bullet-proof MBDA's international arms sales against ITAR-based objections by the United States and to promote Soitec's access to the United States semiconductor and microprocessor technology market.

384.   Aldini is a Swiss company, and it is not a citizen of France.

385.   Legitimate business expectancies are those not grounded on present contractual relationships, but which are commercially reasonable to anticipate, and are property and therefore protected from unjustified interference under international law.

386.   Aldini's strategic equity stake consisting of shares in Dolphin Integration, a company listed on the EURONEXT stock exchange, are property and therefore protected from unjustified interference under international law.

387.   Based on the facts set out in detail in this Complaint, the deprivation and destruction of Aldini's legitimate business expectancy and equity stake, each and separately, constituted a taking of private property in violation of international law by the Republic of France, Ministère des Armées, DGA, and Kammerer of the property of a national of another state, Plaintiff Aldini, because: (i) it did not serve a public purpose, (ii) it was discriminatory because aliens must not be discriminated against or singled out for unequal treatment by the Republic of France, Ministère des Armées, DGA, and Kammerer (iii) and even an otherwise valid taking is illegal without the payment of just compensation.

388.   On information and belief, the purpose of the taking was to avoid MBDA's international arms sales from being curtailed by the United States' objection based on its ITAR-

regulation, and hence the aim was to distort international competition and to promote MBDA's sales by independent wrongful means, which is a commercial purpose and not a public purpose.

389.    On information and belief, Dolphin Integration's defense-related assets and IP were distributed to Dolphin Design and subsequently to MBDA, or controlled by MBDA, both of which are commercial private business enterprises.

390.    On information and belief, the secondary purpose of the taking was to provide Soitec with access to the United States semiconductor and microprocessor market which is a commercial purpose and not a public purpose.

391.    On information and belief, Dolphin Integration's non-defense related assets were distributed to Dolphin Design and subsequently to Soitec and then to Silvaco as part of the Silvaco/Soitec USA/Soitec joint venture and/or cooperation, all of which are commercial private business enterprises.

392.    While Bouvier tried to excuse this illegal behavior by wrapping himself in the French flag ("we have acted with the DGA . . . when there is a sector of sovereignty which is a sector at risk, well, one takes actions and one organizes oneself so that this risk is limited"), his statements roundly acknowledged that the purpose was to protect MBDA's commercial business interests vis-à-vis ITAR objections by the United States and against competition by the United States defense industry ("when sources of supply are potentially at risk").

393.    On information and belief, the sovereignty of the Republic of France was not at risk, MBDA's commercial interests were.

394.    The taking by the Republic of France, Ministère des Armées, DGA, and Kammerer was discriminatory because, on information and belief, it was aimed at aliens generally or at particular aliens (Bouvier: "objective is to avoid the takeover of this business by . . . non-European . . . players").

395.    No compensation whatsoever was paid to Aldini for the loss of its property of either (i) its legitimate business expectance, or (ii) its shares in Dolphin Integration that were made worthless when the Defendants asset stripped and destroyed the company, or (iii) its time, effort, and (iv) reputation that suffered because of the Defendants' actions.

396.    If a taking violates any one of the aforementioned proscriptions, it violates international law.

397.    The memory compiler technology and standard cell libraries of Dolphin Integration exchanged for Aldini's property are present in the United States in connection with a commercial activity carried on in the United States by the Republic of France, in accordance with the first clause of 28 U.S.C. 1605(a)(3), because those assets and IP are now located in California or elsewhere in the United States and are in the possession of Silvaco and, on information and belief, are part of the joint venture between Silvaco, Soitec USA and Soitec, in connection with the Republic of France's promotion of Soitec's access to the United States market and, also, the Republic of France's promotion in the United States of international trade with France and French industry and business, through numerous trade fairs, promotions, and programs in the United States, including through its consulates and embassies, as well as other agencies and agents of the Republic of France in the United States.

398.    On information and belief, Dolphin Integration's defense-related assets and IP are now owned or operated, directly or indirectly, by the Ministère des Armées or DGA via MBDA another entity, while Ministère des Armées or DGA engaged in a commercial activity in the United States, in accordance with the second clause of 28 U.S.C. 1605(a)(3), because Ministère des Armées and DGA assist the French defense industry to sell products in the United States and/or cooperate with MBDA to assist it in doing so, while MBDA is a multi-national group with more than 11.500 employees working together across France, Germany, Italy, Spain and the United Kingdom and the United States and, also, MBDA operates in the United States through MBDA Inc.

399.    The acts by the Republic of France, Ministère des Armées, DGA, and Kammerer were not taken in the public interest but in the interest of their project to sideline the United States' ITAR-based objections to MBDA's international arms sales, and to increase or promote the same to the private commercial benefit of MBDA and MBDA Inc.

400.    The acts by the Republic of France, Ministère des Armées, DGA, and Kammerer were not taken in the public interest but in the interest of their project to have Soitec and Soitec USA gain access to the United States semiconductor and microprocessor market.

401.    As a result of the Republic of France's, Ministère des Armées', and DGA's taking of (i) Aldini's prospective economic advantage and business expectancy, (ii) its 28,466 Dolphin Integration shares, and (iii) Aldini's effort and time expended on its contemplated acquisition of Dolphin Integration, Aldini suffered damages.

402.    The resulting damages were proximately caused by the Defendants' wrongful conduct as alleged in detail in this Complaint with the exact amount to be determined at trial.

403.    Defendant the Republic of France's, Ministère des Armées', DGA's, and Kammerer's conduct was knowing, willful, intentional or deliberate wrongdoing, malicious, oppressive, and reprehensible and carried out with an evil motive, or a conscious act that willfully and wantonly disregarded Aldini's rights, intended to cause and that, in fact, did cause Aldini to suffer harm.  As a result, Aldini is entitled to punitive damages to be awarded against Defendants DGA and Kammerer in an amount to be determined at trial appropriate to deter further such conduct.

## THIRD CAUSE OF ACTION

## AIDING & ABETTING EXPROPRIATION IN VIOLATION OF INTERNATIONAL LAW

**(Against Defendants MBDA, Soitec, Silvaco, Bouvier, Berger, Van den Bossche, Sommelet, Boudre, Beriot, Pesic, Taheri, Depeyrot, Dupont)**

404.    Plaintiff reasserts and realleges, as if fully incorporated here, the allegations set forth above.

405.    Bouvier publicly admitted that "we acted quickly, we acted with partners, we have acted with the DGA."

406.    On information and belief, Bouvier and Defendants MBDA, Soitec, Silvaco, Berger, Van den Bossche, Sommelet, Boudre, Beriot, Pesic, Taheri, Depeyrot, and Dupont were joint actors together with the governmental Defendants and aided and abetted the Republic of

France, Ministère des Armées, DGA, Kammerer in their misappropriation in violation of international law, as set out in detail in this Complaint.

407.    On information and belief, Bouvier, MBDA, Soitec, Silvaco, Bouvier, Berger, Van den Bossche, Sommelet, Boudre, Beriot, Pesic, Taheri, Depeyrot, and Dupont acted with the purpose to facilitate the misappropriation and taking of Aldini's property as alleged in detail in this this Complaint.

408.    On information and belief, Bouvier obtained a direct benefit from aiding and abetting the commission of the violation of international law by the governmental Defendants because he gained political, financial, and career advancement, as alleged in detail in this Complaint.

409.    On information and belief, MBDA, Soitec, Silvaco gained significant commercial advantages from aiding and abetting the commission of the violation of international law by the governmental Defendants, including but not limited to: (i) for MBDA increasing its international arms sales by enabling it to avoid and circumvent ITAR-base objections by the United States, (ii) for Soitec gaining access to the United States semiconductor and microprocessor market, and (iii) for Silvaco gaining access to the Dolphin Integration memory compiler technology and standard cell libraries and all related tangible and intangible assets and commencing a joint-venture with Soitec and Soitec USA, as alleged in detail in this Complaint.

410.    On information and belief, Van den Bossche and Beriot gained significant career and financial advantages from aiding and abetting the commission of the violation of international law by the governmental Defendants, as alleged in detail in this Complaint.

411.    On information and belief, Sommelet, Boudre, Beriot, Pesic, Taheri gained financial advantages because they are stakeholders in their respective companies, Soitec and Silvaco, through shareholdings, incentive pay, and their business reputations and thus gained significant career and financial advantages from aiding and abetting the commission of the violation of international law by the governmental Defendants, as alleged in detail in this Complaint.

412.   On information and belief, while Depeyrot initially resisted the takeover and asset stripping of Dolphin Integration, even refusing to sign documents regarding the transfer of the company's trade name and trademarks, Depeyrot was offered incentives, capitulated, and started cooperating with MBDA/Soitec's and the Republic of France's, Ministère des Armées', DGA's, and Kammerer's plan to strip Dolphin Integration of all its assets and IP.

413.   On information and belief, Depeyrot gained significant financial advantage from aiding and abetting the commission of the violation of international law by the governmental Defendants, as alleged in detail in this Complaint

414.   On information and belief, Dupont acting both as president of Dolphin Design and CEO of Dolphin Integration violated its interests for the benefit of Dolphin Design's owners, MBDA and Soitec, and also put his own personal interests, including compensation for his new position and promotion at Dolphin Design, above those of Dolphin Integration.  In doing so, Dupont gained significant career and financial advantages from aiding and abetting the commission of the violation of international law by the governmental Defendants, as alleged in detail in this Complaint

415.   As a result of Bouvier's, MBDA's, Soitec's, Silvaco's, Bouvier's, Berger's, Van den Bossche's, Sommelet's, Boudre's, Beriot's, Pesic's, Taheri, Depeyrot's, and Dupont's aiding and abetting of the misappropriation in violation of international law of (i) Aldini's prospective economic advantage and business expectancy, (ii) its 28,466 Dolphin Integration shares, and (iii) Aldini's effort and time expended on its contemplated acquisition of Dolphin Integration, Aldini suffered damages.

416.   The resulting damages were proximately caused by these Defendants' wrongful conduct as alleged in detail in this Complaint with the exact amount to be determined at trial.

417.   Defendants Bouvier's, MBDA's, Soitec's, Silvaco's, Bouvier's, Berger's, Van den Bossche's, Sommelet's, Boudre's, Beriot's, Pesic's, Taheri's, Depeyrot's, and Dupont's conduct was knowing, willful, intentional or deliberate wrongdoing, malicious, oppressive, and reprehensible and carried out with an evil motive, or a conscious act that willfully and wantonly disregarded Aldini's rights, intended to cause and that, in fact, did cause Aldini to suffer harm.

As a result, Aldini is entitled to punitive damages to be awarded against Defendants in an amount to be determined at trial appropriate to deter further such conduct.

**FOURTH CAUSE OF ACTION**

**FOR TORT PURSUANT TO CALIFORNIA CIVIL CODE §1708 AND §1714**

**(Against Defendants Silvaco, Pesic, Taheri, Soitec, Soitec USA)**

418.    Plaintiff reasserts and realleges, as if fully incorporated here, the allegations set forth above.

419.    On information and belief, Defendants Silvaco, Pesic, Taheri, Soitec, and Soitec USA through their conduct in California and aimed at California, alleged with particularity in this Complaint, have intentionally done acts of an unreasonable character in disregard of the risk known to them or so obvious that they must have been aware of it, and so great as to make it highly probable that the harm to Aldini alleged in this Complaint would follow, and the Defendants disregarded the consequences to Aldini with actual or constructive knowledge that Aldini's injuries were the probable result of the Defendants' behavior.

420.    Pursuant to Cal. Civ. Code §3333, Defendants Silvaco, Pesic, Taheri, Soitec, and Soitec USA are liable for the damages caused by their willful misconduct in the amount which will compensate for all the detriment proximately caused thereby to Aldini, whether it could have been anticipated or not.

421.    As a result of Defendants Silvaco's, Pesic's, Taheri's, Soitec USA's, and Soitec's willful tortious conduct (i) Aldini's prospective economic advantage and business expectancy to acquire Dolphin Integration and its assets and IP, which Aldini had valued at €649,000,000, and (ii) Aldini's 28,466 Dolphin Integration shares were destroyed, and (iii) Aldini's investment of time and efforts expended on its contemplated acquisition of Dolphin Integration, and (iv) its reputation, suffered damages as a result.

422.    The resulting damages were proximately caused by these Defendants' wrongful conduct in California or aimed at California as alleged in detail in this Complaint with the exact amount to be determined at trial.

423.    Defendants' conduct was knowing, willful, intentional or deliberate wrongdoing, malicious, oppressive, and reprehensible and carried out with an evil motive, or a conscious act that willfully and wantonly disregarded Aldini's rights, intended to cause and that, in fact, did cause Aldini to suffer harm.  As a result, Aldini is entitled to punitive damages in an amount to be determined at trial appropriate to deter further such conduct.

### FIFTH CAUSE OF ACTION

### FOR VIOLATION OF TRADE SECRET LAW

### DEFEND TRADE SECRETS ACT – 18 U.S.C. §§1832-1839

**(Against Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, Beriot)**

424.    Plaintiff reasserts and realleges, as if fully incorporated here, the allegations set forth above.

425.    Defendant Depeyrot, in his capacity as President of Dolphin Integration, and as a member of its board of directors, had a legal obligation to protect the interests of Dolphin Integration and its shareholders, including Aldini, pursuant to Art. 1850 of the French Civil Code and Art. L. 225-251 of the French Commercial Code.

426.    Defendant Dupont, in his capacity as CEO of Dolphin Integration, and as a member of its board of directors, had a legal obligation to protect the interests of Dolphin Integration and its shareholders, including Aldini, pursuant to Art. 1850 of the French Civil Code and Arts. L. 225-56 and L. 225-251 of the French Commercial Code.

427.    Defendants MBDA, Van den Bossche, Soitec, and Beriot, in their capacity as member of the board of Dolphin Integration, had the obligation to conduct themselves in strict compliance with legal requirements related to their function, in particular Art. 1850 of the French Civil Code and Arts. L. 225-35 and L. 225-251 of the French Commercial Code.

428.    These Defendants' resulting legal obligations not to violate any laws are owed not just to the company but to the shareholders directly because Art. 1850 of the French Civil Code states: "Each manager is individually responsible towards the company and towards third parties, either for infringements of laws and regulations, or for infringement of the articles of association, or for mistakes committed in its management."

67

COMPLAINT FOR DAMAGES

429.   Likewise, Art. L. 225-251 of the French Commercial Code makes clear that the managers and directors are liable not just to the company but directly to the shareholders, because it states: "The directors and the chief executive officer are individually or jointly liable, as the case may be, towards the company or towards third parties, either for infringements of the legislative or regulatory provisions applicable to public limited companies, or for violations of the articles of association, or for errors committed in their management."

430.   Defendant company managers' and directors' duty to protect Dolphin Integration's trade secrets are owed directly to the shareholders, including Aldini.

431.   Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, and Beriot in their capacities as officers, directors, and director's representative, respectively, of Dolphin Integration were in the possession and holders of (i) business, (ii) financial, (iii) commercial, (iv) economic (v) scientific, (vi) technical, (vii) engineering, (viii) know-how, (ix) accounting, and (x) legal information that belonged to Dolphin Integration and that fell under the statutory definition of a trade secret and, therefore, they were obligated as the company's officers, directors, and director's representative to safeguard and keep such information secret.

432.   On information and belief, the trade secrets included Dolphin Integration's financial results for 2018, financial and business projections, cash-flow analyses, customer information and lists, market analysis, marketing and growth plans, scientific research concerning semiconductors and microprocessors including efficiency, heat dissipation, and low energy consumption parameters carried out by Dolphin Integration's scientific personnel, engineering and design information for silicon waver materials, substrates, and related technology, libraries of standard cells and memories, trade secrets related to information concerning digital-to-analog converters (DAC), analog-to-digital converters (ADC), Electronic Design Automation (EDA), power regulators (voltage regulation, including linear or switching regulators), and the development of energy-efficient System-on-Chip (SoC).

433.   Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, and Beriot violated the Defend Trade Secrets Act ("DTSA") and in doing so violated their duty not to violate the law owed directly to Aldini.

434.   Dolphin Integration's trade secrets at issue in this Complaint are related to a products or services used in or intended for use in interstate or foreign commerce because Dolphin Integration sold its products all over the world.  The company stated on its website: "With every one of their 500 internationally known clients, Dolphin works on long-term collaborations to bring products and devices with a lower environmental impact to the hands of billions of people every day."  The population of France, where Dolphin Integration was incorporated, is 66 million and hence the "billions of people" Dolphin products find their way to means the products are used in or intended for use in interstate or foreign commerce.

435.   As alleged in this Complaint, Dolphin Integration took strict measures, including those binding its officers, such as Dupont, to keep the company's information secret and had policies in place to ensure compliance.

436.   Dolphin Integration had issued internal regulations establishing a strict and precise confidentiality obligation, that was mentioned and acknowledged in the minutes of the board of directors and by Defendants Depeyrot and Dupont, and which imposed that confidentiality obligation on the company's officers and directors "during the execution of the mandate of [corporate function/title] and for a period of ten years after . . . [f]ailure to comply with this confidentiality obligation will be considered as a particularly serious fault, which would engage the responsibility" of the corporate officers to which it applied, which included the Defendants, and explicitly "including criminal responsibility."

437.   That Dolphin Integration took those obligations seriously was clear from the minutes of the Dolphin Integration board of directors when Dupont joined the company in 2017: "Christian DUPONT shall not disclose or communicate, nor use directly or indirectly, any information or knowledge of any kind acquired during the exercise of his functions at the Company and in the Company, and in particular any information concerning the databases, the clientele, the turnover, the price and other information on the managers and the personnel of all the companies affiliated or related to the Company, as well as any commercial, legal, technical database of the Company or of a affiliated or related company.  Christian DUPONT may not reveal to anyone, in any way and for any reason whatsoever, all plans, studies, sketches, projects,

know-how, manufacturing secrets, and intellectual property rights.  This confidentiality obligation is valid during the execution of the mandate of Chief Executive Officer and for a period of ten (10) years following the end of this contract.  Failure to comply with this obligation of confidentiality will be considered as a particularly serious fault, which would engage the responsibility of Christian DUPONT."

438.    Dolphin Integration's trade secrets described in this Complaint qualify as trade secrets under 18 U.S.C. §1839(3) of the DTSA because they are forms and types of financial, business, scientific, technical, economic, or engineering information as alleged in detail in this Complaint.

439.    As alleged in detail in this Complaint, MBDA, Soitec, Van den Bossche, and Beriot knowingly used Dolphin Integration's trade secrets consisting of (i) business, (ii) financial, (iii) commercial, (iv) economic (v) scientific, (vi) technical, (vii) engineering, (viii) know-how, (ix) accounting, and (x) legal information, to put together and organize MBDA/Soitec's prepack take-over offers of July 6 and 13, 2018, while that information was obtained under and as a result of their mandate as directors of Dolphin Integration.

440.    Those trade secrets were, on information and belief, either directly or indirectly communicated to MBDA, Soitec, Van den Bossche, and Beriot by Depeyrot, Dupont or by other officers of Dolphin Integration per Depeyrot's and Dupont's instructions for use by MBDA and Soitec in their pre-pack offers designed to asset strip and destroy Dolphin Integration.

441.    On information and belief, Defendants Van den Bossche and Beriot in their capacity as Dolphin Integration company directors, or as director's representative, disclosed the company's trade secrets to MBDA and Soitec for their private benefit to create pre-pack offers and to advance their efforts to asset strip and destroy Dolphin Integration.

442.    Once Defendants MBDA and Soitec had acquired dominion over the trade secrets through their acquisition SPV Dolphin Design, through which they acquired the Dolphin Integration assets and IP, on information and belief, MBDA/Soitec/Dolphin Design disclosed and sold those trade secrets to Silvaco in California as part of the joint venture in California with Soitec and Soitec USA.

443.   On information and belief, as alleged in this Complaint, Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, and Beriot intended to and did convert the Dolphin Integration trade secrets to the economic benefit of MBDA, Soitec, Dolphin Design, and Silvaco, while the Defendants intended or knew that their doing so would strip Dolphin Integration of its assets and IP and, inexorably, lead to its liquidation and destruction.

444.   On information and belief, MBDA, Soitec, and the other Defendants in keeping with their common plan with the Republic of France, Ministère des Armées, DGA, and Kammerer to prevent non-French parties from obtaining Dolphin's assets and IP, converted the trade secrets by knowingly appropriating them without authorization and taking them and carrying them away by transferring those trade secrets to their SPV Dolphin Design, and then by transferring Dolphin Integration's non-defense related trade secrets to Silvaco in California in furtherance of their common plan and in furtherance of the Defendants' conspiracy alleged in this Complaint.

445.   On information and belief, MBDA, Soitec, and the other Defendants in keeping with their common plan and in furtherance of their conspiracy with the Republic of France, Ministère des Armées, DGA, and Kammerer to prevent non-French parties from obtaining Dolphin's assets and IP, converted the trade secrets by receiving such information, knowing the same to have been appropriated, obtained, or converted, without authorization, by MBDA's employee Van den Bossche, and by Soitec's employee Beriot, who acted as Trojan Horse directors on the Dolphin Integration board and fed back the trade secrets to their employers in violation of Van den Bossche's and Beriot's duties as directors to safeguard those trade secrets and in breach of their duties of confidentiality, loyalty, and to avoid conflicts of interest.

446.   On information and belief, Defendants MBDA, Soitec, the Republic of France, Ministère des Armées, DGA, and Kammerer conspired with Van den Bossche and Beriot, and with each other, to commit these offences while and one or more of them committed an act in California, as alleged in this Complaint, in furtherance of their conspiracy.

447.   On information and belief, in doing so, Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, and Beriot misappropriated Dolphin Integration's trade secrets in the

sense of 18 U.S.C. §1839(5)(A) because, as alleged in detail in this Complaint, they knew or had reason to know that the trade secrets were acquired by improper means.

448.    On information and belief, Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, and Beriot committed misappropriation because, as alleged in detail in this Complaint, they disclosed Dolphin Integration's non-defense related trade secrets to Silvaco, Pesic, and Taheri in the sense of 18 U.S.C. §1839(5)(B)(i) because they used improper means to acquire knowledge of the trade secrets as alleged in this Complaint.

449.    On information and belief, Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, and Beriot committed misappropriation because, as alleged in detail in this Complaint, they disclosed Dolphin Integration's non-defense related trade secrets to Silvaco, Pesic, and Taheri in the sense of 18 U.S.C. §1839(5)(B)(ii)(I) because at the time of disclosure they knew or had reason to know that the knowledge of the trade secret was derived from or through a person who had used improper means to acquire the trade secret.

450.    On information and belief, Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, and Beriot committed misappropriation because, as alleged in detail in this Complaint, they disclosed Dolphin Integration's non-defense related trade secrets to Silvaco, Pesic, and Taheri in the sense of 18 U.S.C. §1839(5)(B)(ii)(II) because the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets.

451.    On information and belief, Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, and Beriot committed misappropriation because, as alleged in detail in this Complaint, they disclosed Dolphin Integration's non-defense related trade secrets to Silvaco, Pesic, and Taheri in the sense of 18 U.S.C. §1839(5)(B)(ii)(III) because they were derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret because Defendants in their capacity as Dolphin Integration officers, directors, and director's representative owed a duty of confidentiality, loyalty and to avoid conflicts of interest, and not to violate any law, not just to the company but directly to the shareholders, including Aldini, pursuant to Art. L. 225-251 of the French Commercial Code which states: "directors and the chief executive officer are individually or jointly liable, as the case may be . . . towards third

parties . . . for infringements of the legislative or regulatory provisions applicable to public limited companies" and under Art. 1850 of the French Civil Code which states: "Each manager is individually responsible . . . towards third parties . . . for infringements of laws."

452.    The Defend Trade Secrets Act applies to the Defendants' conduct because, , as alleged in detail in this Complaint, while it took place in France, pursuant to 18 U.S.C. §1837(2) acts "in furtherance of" the offenses alleged in this Complaint were committed in the United States because, on information and belief, (i) MBDA and Soitec communicated with Silvaco in California directly, and through its French subsidiary Silvaco France, in connection with the secret pre-pack offers that were composed in part with the misappropriated Dolphin Integration trade secrets, including the company's financial information, (ii) MBDA and Soitec conspired and communicated with Silvaco located in California, including with Defendants Pesic and Taheri, in connection with Silvaco acquiring the Dolphin Integration assets and IP, together with all the tangible and intangible assets belonging thereto, for use in Silvaco's business in California, (iii) during the secret pre-pack proceeding MBDA and Soitec worked together with Silvaco located in California to hide its interest in the Dolphin Integration assets and IP, (iv) in doing so MBDA and Soitec colluded with Silvaco located in California to suppress the price and to avoid the assets and IP becoming part of a public bankruptcy tender and sale, (v) in doing so MBDA and Soitec colluded with Silvaco located in California to suppress the price thus committing a fraud on the bankruptcy court roughly equivalent to the situation covered by 11 U.S.C. §363(n) of the U.S. Bankruptcy Code because the sale price at the pre-pack bankruptcy proceeding was controlled by an agreement among potential bidders, (vi) MBDA, Soitec, and Dolphin Design negotiated the sale of Dolphin Integration's memory compiler technology and standard cell libraries with Silvaco in California, (vii) Silvaco in California pursuant to the Defendants' common plan and in furtherance of their conspiracy acquired and obtained the Dolphin Integration trade secrets embodied in the memory compiler technology and standard cell libraries that MBDA, Soitec, and Dolphin Design sold to Silvaco in California, and (viii) Silvaco located in California is developing, designing, manufacturing, promoting, marketing, and selling products or services in California and throughout the United States embodying or derived from or, to some

extent, dependent on the memory compiler technology and standard cell libraries of Dolphin Design containing such trade secrets, or is using the trade secrets for that purpose.  Or, at least, Silvaco committed acts in furtherance of such activities in the United States, as alleged in detail in this Complaint.

453.    On information and belief, pursuant to 18 U.S.C. §1837(2) additional acts "in furtherance of" the offenses alleged in this Complaint were committed in the United States because Carlos Mazure, Executive Vice-President of Soitec, joined the Silvaco Board of Directors four months before Silvaco publicly announced that it had acquired the Dolphin Integration memory compiler technology and standard cell libraries.

454.    On information and belief, Mr. Mazure disclosed, discussed, and used Dolphin Integration's trade secrets during his close collaboration with Silvaco, located in California, on strategic planning and during Mr. Mazure's role in growing Silvaco's business in California and the United States, as alleged in this Complaint.

455.    On information and belief, Mr. Mazure worked with Silvaco, Pesic, and Taheri located in California in connection with the development, manufacturing, and marketing of products, containing the misappropriated trade secrets, for sale in California and the United States.

456.    Defendants Depeyrot's, Dupont's, MBDA's, Van den Bossche's, Soitec's, and Beriot's duty to protect the trade secrets owed to Aldini as one of Dolphin Integration's shareholders follows directly from Art. 1850 of the French Civil Code ("Each manager is individually responsible towards the company and towards third parties . . . for infringements of laws") and Art. L. 225-251 of the French Commercial Code ("The directors and the chief executive officer are individually or jointly liable, as the case may be, towards the company or towards third parties, either for infringements of the legislative or regulatory provisions applicable to public limited companies") which apply to their activities violating the DTSA that they carried out in France.

457.    Hence, Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, Beriot violated the DTSA a while acts in furtherance of their misappropriation, by acquisition, use and

1   disclosure, were committed in the United States in furtherance of the Defendants' offenses, and

2   they proximately caused damages to Aldini to whom Defendants Depeyrot, Dupont, MBDA, Van

3   den Bossche, Soitec, and Beriot owe a direct duty not to violate the DTSA.

4          458.    Defendants Defendants Depeyrot's, Dupont's, MBDA's, Van den Bossche's,

5   Soitec's, and Beriot's conduct proximately caused Aldini harm for which Defendants owe Aldini

6   damages, the exact amount to be established at trial.

7          459.    Defendants' conduct was knowing, willful, intentional or deliberate wrongdoing,

8   malicious, oppressive, and reprehensible and carried out with an evil motive, or a conscious act

9   that willfully and wantonly disregarded Aldini's rights, intended to cause and that, in fact, did

10  cause Aldini to suffer harm.  As a result, Aldini is entitled to punitive damages in an amount to be

11  determined at trial appropriate to deter further such conduct.

12                              **SIXTH CAUSE OF ACTION**

13          **FOR AIDING AND ABETTING VIOLATION OF TRADE SECRET LAW**

14              **DEFEND TRADE SECRETS ACT – 18 U.S.C. §§1832-1839**

15  **(Against Defendants Soitec USA, Silvaco, Taheri, Pesic, the Republic of France, Ministère**

16          **des Armées, DGA, Kammerer, Bouvier, Berger, Sommelet, Boudre)**

17         460.    Plaintiff reasserts and realleges, as if fully incorporated here, the allegations set

18  forth above.

19         461.    On information and belief, Defendants Soitec Soitec USA, Silvaco, Taheri, Pesic,

20  the Republic of France, Ministère des Armées, DGA, Kammerer, Bouvier, Berger, Sommelet, and

21  Boudre aided and abetted Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec,

22  Beriot in violating the DTSA.

23         462.    On information and belief, as alleged in detail in this Complaint, Defendants the

24  Republic of France, Ministère des Armées, DGA, Kammerer, and Bouvier had actual knowledge

25  of those violations because, on information and belief, the violations were committed at the

26  instigation, direction, under the supervision and with the approval of Defendants the Republic of

27  France, Ministère des Armées, DGA, Kammerer, and Bouvier as alleged in this Complaint.

28

463.    On information and belief, as alleged in detail in this Complaint, Defendants Berger, Sommelet, and Boudre had actual knowledge of those violations because they were in charge of MBDA and Soitec, respectively, while those companies and their employees Van den Bossche and Beriot committed the violations, and Berger, Sommelet, Boudre at the instigation, direction, under the supervision and with the approval of Defendants the Republic of France, Ministère des Armées, DGA, and Kammerer as alleged in this Complaint, authorized the participation of MBDA, Van den Bossche, Soitec, and Beriot in the conspiracy to strip Dolphin Integration of its assets, IP, and trade secrets.

464.    On information and belief, as alleged in detail in this Complaint, Defendants Soitec USA, Silvaco, Taheri, Pesic had actual knowledge of the violations because Soitec and Silvaco's French subsidiary were present in Court during the pre-pack proceeding when the other Defendants carried out their plan to strip Dolphin Integration of its assets, IP, and trade secrets and to drive the company into liquidation and to destroy it.

465.    As alleged in detail in this Complaint, Defendants Soitec USA, Silvaco, Taheri, and Pesic had actual knowledge of those violations because, on information and belief, they were part of the Defendants' conspiracy to transfer the non-defense related Dolpin Integration assets, IP, and trade secrets to California for use by Silvaco in developing, designing, manufacturing, marketing and selling products based on or incorporating the Dolphin Integration trade secrets in a joint venture with Soitec and Soitec USA.

466.    On information and belief, Defendants Pesic and Taheri were not mere employees of Silvaco but were the primary participants in negotiating and executing the participation in the conspiracy and misappropriation, including the acquisition and use of the trade secrets.

467.    On information and belief, Defendants Bouvier and Berger were not mere employees of MBDA but were the primary participants in negotiating and executing the participation in the conspiracy and misappropriation, including the acquisition and use of the trade secrets.

468.    On information and belief, Defendants Sommelet, Boudre were not mere employees of Soitec but were the primary participants in negotiating and executing the

1   participation in the conspiracy and misappropriation, including the acquisition and use of the

2   trade secrets.

3          469.    In carrying out the acts alleged in this Complaint, Defendants Soitec USA,

4   Silvaco, Taheri, Pesic, the Republic of France, Ministère des Armées, DGA, Kammerer, Bouvier,

5   Berger, Sommelet, and Boudre provided substantial assistance to the other Defendants' violation

6   of the DTSA, knowing that the other Defendants' conduct constitutes a tort.

7          470.    Defendants Soitec USA's, Silvaco's, Pesic's, Taheri's, the Republic of France's,

8   Ministère des Armées', DGA's, Kammerer's, Bouvier's, Berger's, Sommelet's, and Boudre's

9   conduct proximately caused Aldini harm for which Defendants owe Aldini damages, the exact

10  amount to be established at trial.

11         471.    Defendants' conduct was knowing, willful, intentional or deliberate wrongdoing,

12  malicious, oppressive, and reprehensible and carried out with an evil motive, or a conscious act

13  that willfully and wantonly disregarded Aldini's rights, intended to cause and that, in fact, did

14  cause Aldini to suffer harm.  As a result, Aldini is entitled to punitive damages in an amount to be

15  determined at trial appropriate to deter further such conduct.

16                              **SEVENTH CAUSE OF ACTION**

17                       **FOR VIOLATION OF TRADE SECRET LAW**

18             **ART. L. 151-4 AND 151-5 OF THE FRENCH COMMERCIAL CODE**

19        **(Against Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, Beriot)**

20         472.    Plaintiff reasserts and realleges, as if fully incorporated here, the allegations set

21  forth above.

22         473.    French law concerning trade secrets provides for the protection of tangible or

23  intangible assets.  Such legal protection is particularly important for a technology company like

24  Dolphin Integration and its shareholders.  To dissipate or reveal trade secrets is seriously

25  prejudicial to a company and its shareholders.

26         474.    It is for this reason that Law No. 2018-670 of July 30, 2018, transposed Directive

27  2016/943 of the European Parliament and of the Council of June 8, 2016, on the "Protection of

28  undisclosed know-how and business information (trade secrets) against their unlawful acquisition,

use and disclosure" into French law.  The law entered into force on December 14, 2018, with regard to most of its provisions, and added new articles to the French Commercial Code as well as other provisions to the French Intellectual Property Code.

475.    Art. L. 151-1 of the French Commercial Code thus defines and protects trade secrets as follows: "Any information meeting the following criteria is protected under business secrecy: (1) It is not, in itself or in the exact configuration and assembly of its elements, generally known or easily accessible to people familiar with this type of information because of their sector of activity; (2) It has a commercial value, actual or potential, because of its secret nature; (3) It is subject to reasonable protection measures by its legitimate holder, taking into account the circumstances, to keep it secret."

476.    In short, under the new French statutory definition of a trade secret, for protection to attach, the information must (i) be secret, (ii) have a commercial value, and (iii) the company must have taken reasonable protective measures.

477.    Art. L. 151-4 of the French Commercial Code makes it illegal to obtain a trade secret when it results: "(1) From unauthorized access to any document, object, material, substance or digital file which contains the secret or from which it can be deduced, or from an unauthorized appropriation or copy of these elements; (2) Any other behavior considered, in view of the circumstances, to be unfair and contrary to custom in commercial matters."

478.    Art. L.151-5 of the French Commercial Code also makes liable those who are: ". . . placing on the market . . . any product significantly resulting from a breach of trade secret protection will also be considered as an illicit usage when the person who conducts such activities knew, or ought to know given the circumstances, that this secret was illicitly used."

479.    As alleged in detail in this Complaint, MBDA, Soitec, Van den Bossche, and Beriot knowingly used Dolphin Integration's trade secrets to put together and organize MBDA/Soitec's prepack take-over offers of July 6 and 13, 2018, while that information was obtained under and because of their mandate as directors of Dolphin Integration.

480.    Those trade secrets were, on information and belief, either directly or indirectly communicated to them by Depeyrot, Dupont or by other officers of Dolphin Integration under

78

Depeyrot's and Dupont's command for use by MBDA and Soitec in their pre-pack offers designed to lead to the asset stripping and destruction of Dolphin Integration.

481.   As a result, Defendants Depeyrot and Dupont violated Art. L. 151-4 of the French Commercial Code because such "behavior [is] considered, in view of the circumstances, to be unfair and contrary to custom in commercial matters" and violates their duties to the company and shareholders under French law.

482.   On information and belief, Defendants Van den Bossche and Beriot in their capacity Dolphin Integration company directors, or as director's representative, disclosed the company's trade secrets to MBDA and Soitec for their private benefit to create pre-pack offers and to advance their efforts to strip and destroy Dolphin Integration.

483.   As a result, Defendants Van den Bossche and Beriot violated Art. L. 151-4 of the French Commercial Code because their obtaining of those trade secrets for that purpose constituted "(1) . . . unauthorized access to any document, object, material, substance or digital file which contains the secret or from which it can be deduced, or from an unauthorized appropriation or copy of these elements" and because it came about as a result of "(2) . . . behavior considered, in view of the circumstances, to be unfair and contrary to custom in commercial matters."

484.   On information and belief, Defendants MBDA and Soitec in their private capacity obtained Dolphin Integration's trade secrets from Depeyrot and Dupont, and from MBDA's and Soitec's employees on the company's board, Messrs. Van den Bossche and Beriot, respectively, as well as with the acquiescence and cooperation of the other board members.

485.   As a result, Defendants MBDA and Soitec violated Art. L. 151-4 of the French Commercial Code because their obtaining of those trade secrets constituted "(1) . . . unauthorized access to any document, object, material, substance or digital file which contains the secret or from which it can be deduced, or from an unauthorized appropriation or copy of these elements" and because it came about as a result of "(2) . . . behavior considered, in view of the circumstances, to be unfair and contrary to custom in commercial matters."

486.     Defendants Soitec and MBDA also violated Art. L. 151-5 of the French Commercial Code because they acquired Dolphin Integration's assets and IP as a result of their pre-pack offer that they put together, on information and belief, with the trade secrets they had obtained.

487.     MBDA and Soitec then placed on the market Dolphin Integration's memory compiler technology and standard cell libraries, which were subsequently sold to Silvaco.  Those memory compiler technology and standard cell libraries are "product[s] significantly resulting from a breach of trade secret protection" under Art. L. 151-5, and MBDA and Soitec placing these on the market though the sale to Silvaco "will also be considered as an illicit usage when the person who conducts such activities [MBDA and Soitec] knew, or ought to know given the circumstances, that this secret was illicitly used."

488.     For these violations Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, and Beriot are liable to Aldini directly because Art. L. 225-251 of the French Commercial Code states: "directors and the chief executive officer are individually or jointly liable, as the case may be . . . towards third parties . . . for infringements of the legislative or regulatory provisions applicable to public limited companies" and under Art. 1850 of the French Civil Code which states: "Each manager is individually responsible . . . towards third parties . . . for infringements of laws."

489.     Pursuant to Art. 1240 of the French Civil Code ("Any act whatsoever of person which causes damage to others obliges him through whose fault it was caused to remedy it"), Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, and Beriot owe Aldini compensation for the damages it suffered as a result, the exact amount to be established at trial.

490.     Defendants' conduct was knowing, willful, intentional or deliberate wrongdoing, malicious, oppressive, and reprehensible and carried out with an evil motive, or a conscious act that willfully and wantonly disregarded Aldini's rights, intended to cause and that, in fact, did cause Aldini to suffer harm.  As a result, Aldini is entitled to punitive damages in an amount to be determined at trial appropriate to deter further such conduct.

**EIGHTH CAUSE OF ACTION**

**FOR AIDING AND ABETTING VIOLATION OF TRADE SECRET LAW**

**ART. L. 151-4 AND 151-5 FRENCH COMMERCIAL CODE**

**(Against Defendants the Republic of France, Ministère des Armées, DGA, Kammerer, Bouvier, Berger, Sommelet, Boudre)**

491.    Plaintiff reasserts and realleges, as if fully incorporated here, the allegations set forth above.

492.    On information and belief, the Republic of France, Ministère des Armées, DGA, and Kammerer conspired with MBDA and Soitec, and their employees Bouvier, Berger, Sommelet, Boudre, Van den Bossche, and Beriot to have them obtain Dolphin Integration's trade secrets in violation of Art. L. 151-4 of the French Commercial Code in the manner alleged in detail in this Complaint.

493.    On information and belief, the Republic of France, Ministère des Armées, DGA, Kammerer, Bouvier, Berger, Sommelet, and Boudre aided and abetted Defendants Depeyrot's, Dupont's, MBDA's, Van den Bossche's, Soitec's, and Beriot's violations of Art. L. 151-4 because, as alleged in detail in this Complaint, the Republic of France, Ministère des Armées, DGA, Kammerer, Bouvier, Berger, Sommelet, and Boudre provided substantial assistance and encouragement to MBDA/Soitec and the other Defendants, who conspired with them, to obtain Dolphin Integration's trade secrets for use in MBDA/Soitec's pre-pack offer to strip and, ultimately, destroy Dolphin Integration by driving it into liquidation in order to prevent other, non-French parties from gaining access to Dolphin Integration's assets and IP.

494.    On information and belief, Defendants the Republic of France, Ministère des Armées, DGA, Kammerer, Bouvier, Berger, Sommelet, and Boudre did so knowing that those trade secrets and information resulted from (i) unauthorized access, and (ii) behavior considered, in view of the circumstances, to be unfair and contrary to custom in commercial matters because placing MBDA's Mr. Van den Bossche and Soitec's Mr. Beriot on the board Dolphin Integration to act as Trojan Horse directors who fed the company's trade secrets back to their employers and, indirectly, to the Republic of France, Ministère des Armées, DGA, and Kammerer was an integral

part of the Defendants' common plan and conspiracy to strip Dolphin Integration of its assets, IP, and trade secrets.

495.    On information and belief, the Republic of France, Ministère des Armées, DGA, Kammerer, Bouvier, Berger, Sommelet, and Boudre also aided and abetted Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, and Beriot in their violation of trade secret law, because the Republic of France, Ministère des Armées, DGA, Bouvier, Berger, Sommelet, and Boudre themselves, too, violated Art. L. 151-5 because they caused the Soitec and Silvaco defendants to design, manufacture, and to be placing on the market product(s) significantly resulting from a breach of trade secret protection that used the non-defense related Dolphin Integration assets and IP, while the Republic of France, Ministère des Armées, DGA, Kammerer, Bouvier, Berger, Sommelet, and Boudre knew, or ought to know given the circumstances, that those trade secrets were illicitly obtained and used, and that the pre-pack offers that enabled Soitec to acquire them were the result of and based on misappropriated trade secrets belonging to Dolphin Integration.

496.    On information and belief, as alleged in this Complaint, Defendants Kammerer, Bouvier, Berger, Sommelet, Boudre, Depeyrot and Dupont personally directed or participated in the tortious conduct, including the acts committed in California to carry out the conspiracy and plan to transfer the stripped, non-defense related Dolphin Integration assets, IP, and trade secrets that were tortiously acquired to open the United States microprocessor market for Soitec, in order to ensure its cooperation with the conspiracy and the secret pre-pack take over.

497.    On information and belief Defendants Kammerer, Bouvier, Berger, Sommelet, Boudre, Depeyrot and Dupont were not mere employees, but they were the primary participants in directing MBDA, Soitec, and/or Dolphin Design while executing their common plan and negotiating the sale to Silvaco in California.

498.    Defendants the Republic of France's, Ministère des Armées', DGA's, Kammerer's, Bouvier's, Berger's, Sommelet's, Boudre's conduct proximately caused Aldini harm for which Defendants owe Aldini damages, the exact amount to be established at trial.

499.    Defendants' conduct was knowing, willful, intentional or deliberate wrongdoing, malicious, oppressive, and reprehensible and carried out with an evil motive, or a conscious act that willfully and wantonly disregarded Aldini's rights, intended to cause and that, in fact, did cause Aldini to suffer harm.  As a result, Aldini is entitled to punitive damages in an amount to be determined at trial appropriate to deter further such conduct.

## NINTH CAUSE OF ACTION

### FOR AIDING AND ABETTING VIOLATION OF TRADE SECRET LAW

### ART. L. 151-4 AND 151-5 FRENCH COMMERCIAL CODE

**(Against Defendants Soitec USA, Silvaco, Pesic, Taheri)**

500.    Plaintiff reasserts and realleges, as if fully incorporated here, the allegations set forth above.

501.    On November 12, 2020, Silvaco announced that it had acquired, in California, Dolphin Integration's memory compiler technology and standard cell libraries and, on information and belief, all tangible and intangible assets related to the same.

502.    On information and belief, Defendants Soitec USA, Silvaco, Pesic, Taheri aided and abetted Depeyrot's, Dupont's MBDA's, Van den Bossche's, Soitec's, and Beriot's violations of Art. L. 151-4(1) of the French Commercial Code, which makes it illegal to obtain a trade secret resulting from (i) unauthorized access, and (ii) behavior considered, in view of the circumstances, to be unfair and contrary to custom in commercial matters.

503.    On information and belief, Defendants Soitec USA, Silvaco, Pesic, Taheri knew that MBDA, Soitec, and Dolphin Design had acquired the Dolphin Integration trade secrets in that manner alleged in this Complaint and that the other Defendants were violating the trade secret law because Defendants Soitec USA, Silvaco, Pesic, Taheri conspired with MBDA and Soitec to strip Dolphin Integration of its assets and IP through MBDA/Soitec's pre-pack takeover prepared with the aid of those trade secrets.

504.    On information and belief, in the process leading up to the secret pre-pack proceeding and during, as a result of those communications Silvaco, Pesic, and Taheri learned, knew or should have known that the information contained in, and that made possible, the July 6

and 13, 2018, pre-pack offers consisted of Dolphin Integration's trade secret because such information was not publicly available and could only have been acquired by Soitec and MBDA through their role as directors of Dolphin Integration and the presence on its board of MBDA's employee Van den Bossche and Soitec's employee Beriot.

505.     Silvaco's French subsidiary was in court in France during the secret pre-pack proceeding to monitor the situation and, on information and belief, to report to Silvaco on progress of the common plan under which, ultimately, MBDA/Soitec would make the non-defense related Dolpin Integration assets and IP, in particular the Dolphin Integration memory compiler technology and standard cell libraries, and trade secrets related to same, available to Defendants Soitec USA, Silvaco, Pesic, Taheri in Califiornia.

506.     On information and belief, Silvaco, Pesic, and Taheri, to acquire and use the Dolphin Integration trade secrets, colluded with the buyers MBDA and Soitec not to reveal Silvaco interest in the Dolphin Integration assets and IP in order to suppress the price and to avoid the bankruptcy court from ordering publicity, a public tender, and a public bankruptcy sale of the Dolphin Integration assets and IP.

507.     On information and belief, when acquiring the Dolphin Integration memory compiler technology and standard cell libraries, and trade secrets related to same from MBDA, Soitec, and/or Dolphin Design, Defendants Silvaco, Pesic, and Taheri knew or should have known that the information was resulting from a breach of trade secret protection.

508.     On information and belief, the need for secrecy then and prior to Silvaco's November 12, 2020, public announcement that it had acquired the Dolphin Integration memory compiler technology and standard cell libraries also put Silvaco, Pesic, Taheri on notice, and they should have known as a result, that those assets, IP, and trade secrets which they were using for Silvaco products designed, manufactured and to be placed and/or being placed on the market, and being promoted and sold in California by Silvaco, Pesic, and Taheri, significantly resulted from a breach of trade secret protection in France.

509.     Defendants Silvaco, Pesic, and Taheri thus themselves participated in the violations of Art. L. 151-4 and 151-5 of the French Commercial Code by conspiring with

84

COMPLAINT FOR DAMAGES

1  Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, Beriot, and *vice versa*, while

2  Defendants Silvaco, Pesic, and Taheri knew of the other Defendants' violations.

3      510.    On information and belief, Defendants Soitec USA, Silvaco, Pesic, Taheri aided

4  and abetted the other Defendants also because Soitec USA, Silvaco, Pesic, and Taheri themselves

5  violated Art. L. 151-4(2) as they obtained those trade secrets as a result of: "Any other behavior

6  considered, in view of the circumstances, to be unfair and contrary to custom in commercial

7  matters." The behavior of MBDA and its employee Mr. Van den Bossche and of Soitec and its

8  employee Mr. Beriot fit that description as alleged in this Complaint.

9      511.    On information and belief, Defendants Soitec USA, Silvaco, Pesic, and Taheri are

10 placing on the market products incorporating or manufactured using the Dolphin Integration

11 memory compiler technology and standard cell libraries, and trade secrets related to same, that

12 Silvaco obtained from Soitec, and which are therefore significantly resulting from the alleged

13 breach of trade secret protection by Defendants Depeyrot, MBDA, Van den Bossche, Soitec, and

14 Beriot.

15     512.    On information and belief, Defendants Pesic and Taheri personally directed or

16 participated in the tortious conduct, including the acts committed in California to carry out the

17 conspiracy and plan to transfer the stripped non-defense related Dolphin Integration assets, IP,

18 and trade secrets that were tortiously acquired to open the United States microprocessor market

19 for Soitec via its joint venture with Silvaco.

20     513.    On information and belief Defendants Pesic and Taheri were not mere employees,

21 but they were the primary participants in negotiating and executing the sale of the

22 misappropriated Dolphin Integration non-defense related assets, IP, and trade secrets to Silvaco in

23 California.

24     514.    Defendants Soitec USA's, Silvaco's, Pesic's, and Taheri's conduct proximately

25 caused Aldini harm for which Defendants owe Aldini damages, the exact amount to be

26 established at trial.

27     515.    Defendants' conduct was knowing, willful, intentional or deliberate wrongdoing,

28 malicious, oppressive, and reprehensible and carried out with an evil motive, or a conscious act

1   that willfully and wantonly disregarded Aldini's rights, intended to cause and that, in fact, did

2   cause Aldini to suffer harm.  As a result, Aldini is entitled to punitive damages in an amount to be

3   determined at trial appropriate to deter further such conduct.

**TENTH CAUSE OF ACTION**

**FOR MANAGEMENT TORTS**

**(Against Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, Beriot)**

7   516.   Plaintiff reasserts and realleges, as if fully incorporated here, the allegations set

8   forth above.

9   517.   Despite the board of directors having been mandated by Dolphin Integration's

10   General Meeting of Shareholders on October 19, 2017, and on February 8, 2018, to raise

11   additional financing for the company, on information and belief, Depeyrot, Dupont, and the

12   Dolphin Integration board members did nothing, thus deliberately exacerbating Dolphin

13   Integration's purported financial predicament, so as to open the door for the secret raid by MBDA

14   and Soitec who stripped the company of all its assets and IP for no more than €200,004

15   (approximately $235,000) through a secret pre-pack bankruptcy proceeding while the company

16   earlier that year had surpassed a market capitalization in excess of €51,000,000 (approximately

17   $60,000,000).

18   518.   On information and belief, the Dolphin Integration board members, including

19   MBDA, Van den Bossche, Soitec, and Beriot, and its President Depeyrot, and CEO Dupont failed

20   to pursue the refinancing or capital injections by several shareholders who had offered financial

21   assistance, such as Groupe David Gerbier, CLEG Mobilités-Gerbier, and Mr. Boutin.  The latter

22   offered to inject €2,500,000 into Dolphin Integration.

23   519.   Instead, on information and belief, the Defendants conspired and cooperated in

24   passing MBDA/Soitec's pre-pack offer in a secret bankruptcy proceeding that allowed the

25   MBDA and Soitec defendants and Silvaco to acquire all Dolphin Integration's business, assets,

26   and IP, including those of its subsidiary companies, for a mere €200,004.

27   520.   On information and belief, the Dolphin Integration board or management failed to

28   reach out to other shareholders to seek a solution to the company's purported financial

predicament, such as Aldini, which is a merchant banking firm that invest more than €100 million per year in small/medium sized enterprises and publicly quoted companies.

521.    The Dolphin Integration board members including MBDA, Van den Bossche, Soitec, and Beriot, and its President Depeyrot, and CEO Dupont failed to publish the availability for sale of Dolphin Integration, its business, assets, and IP in order to seek and obtain competing offers with a better price for a pre-pack sale organized by the trustee that could have avoided the secret sale to MBDA and Soitec for a price the French bankruptcy court deemed unsatisfactory, such as from Aldini which would have submitted the same had these Defendants approached it, and which later did make a superior offer to Dolphin Integration's trustee Mr. Roumezi.

522.    On information and belief, the Dolphin Integration board members including MBDA, Van den Bossche, Soitec, and Beriot, and its President Depeyrot, and CEO Dupont failed to contest and prevent the fraud committed by, and cooperated with MBDA, as a member of the Dolphin Integration board, and with Soitec, in composing and executing the MBDA/Soitec secret pre-pack offers of July 6 and 13, 2018, in violation of: (i) the prohibition found in Art. L. 642-3 of the French Commercial Code that prohibits the corporate officers of a company placed in judicial liquidation to make a take-over offer for the company or its assets, either directly or through an intermediary while MBDA's contested relinquishment of its board seat on June 5, 2018, would not be published until August 19, 2018, as a result of which MBDA was still a member of the Dolphin Integration board of directors at the time of its illegal offer, and (ii) and the board members including MBDA, Van den Bossche, Soitec, and Beriot, and its President Depeyrot, and CEO Dupont communicated illegally with MBDA and Soitec to provide them with confidential company information and trade and business secrets belonging to Dolphin Integration in order to enable MBDA and Soitec to prepare and present their pre-pack take-over offer.

523.    The Dolphin Integration board members including MBDA, Van den Bossche, and its President Depeyrot, and CEO Dupont failed to contest and prevent the fraud committed by, and cooperated with, the purported 'independent' Dolphin Integration board members José Beriot and Harold Van den Bossche.

524.   MBDA, Van den Bossche, and Soitec also participated in the fraud committed by Beriot, who was at the same time Soitec's Vice President of Special Operations, and who acted as an accomplice of Soitec and MBDA when they composed and executed their secret pre-pack offers of July 6 and 13, 2018, in violation of: (i) the prohibition found in Art. L. 642-3 of the French Commercial Code that prohibits the corporate officers of a company placed in judicial liquidation to make a take-over offer for the company or its assets, either directly or through an intermediary while MBDA's contested relinquishment of its board seat on June 5, 2018, would not be published until August 19, 2018, as a result of which MBDA was still a member of the Dolphin Integration board of directors at the time of its illegal offer, and (ii) and the board members including MBDA, Van den Bossche, Soitec, and Beriot, and its President Depeyrot, and CEO Dupont communicated illegally with MBDA and Soitec to provide them with confidential company information and trade and business secrets belonging to Dolphin Integration in order to enable MBDA and Soitec to prepare and present their pre-pack take-over offer.

525.   The Dolphin Integration board members including MBDA, Van den Bossche, Soitec, and Beriot, and its President Depeyrot failed to contest and prevent the fraud committed by Christian Dupont who was the CEO of Dolphin Integration (from February 9, 2018, until May 19, 2019) who cooperated with the fraudulent secret pre-pack take-over offer by MBDA and Soitec and who would be named President of Dolphin Design, the SPV in which the assets and IP were placed by MBDA and Soitec, while Dupont was until December 5, 2018, at the same time CEO and President of, respectively, Dolphin Integration and Dolphin Design.

526.   The Dolphin Integration board members including MBDA, Van den Bossche, Soitec, and Beriot, and the company's President Depeyrot, and CEO Dupont failed to contest and prevent the infringement of the trademark and company name "DOLPHIN INTEGRATION" by MBDA and Soitec.

527.   MBDA and Soitec created and incorporated the company "DOLPHIN DESIGN", which was the vehicle in which MBDA/Soitec placed the fraudulently acquired assets and IP, without any right and in flagrant violation of the intellectual property rights licensed by Depeyrot to Dolphin Integration, while the assets and IP were seized by MBDA/Soitec on July 21, 2018,

1  and while Depeyrot did not re-license the intellectual property rights in that trademark and the

2  name "DOLPHIN INTEGRATION" to Dolphin Design until August 27, 2018.

3        528.  The infringement constitutes a criminal offence under Art. L. 716-9 of the French

4  Intellectual Property Code.

5        529.  The Dolphin Integration board members including MBDA, Van den Bossche,

6  Soitec, and Beriot, and the company's President Depeyrot, and CEO Dupont failed to take

7  appropriate action in that they: (i) did not comply with the moratorium concluded with the CCSF

8  (*la Commission départementale des Chefs des Services Financier* – the Departmental

9  Commissions of Heads of Financial Services, which assists companies in difficulty that are late in

10  the payment of any sum for taxes, duties, social security contributions, unemployment insurance

11  contributions, etc.) on December 11, 2017, resulting in the termination of said agreement on May

12  17, 2018, while they were warned and aware of the financial state of affairs of Dolphin

13  Integration because they had (a) been mandated by the shareholders to raise capital and obtain

14  additional financing, and (b) had ignored and rejected offers of financial support from third-

15  parties and shareholders such as Groupe David Gerbier, CLEG Mobilités-Gerbier, and Mr.

16  Boutin, and (ii) failed to comply with the alert procedure initiated by Dolphin Integration's

17  statutory auditor in December 2017 in the absence of action by the board of directors and

18  deliberation of the General Meeting of Shareholders to arrange for a business continuity solution,

19  thus violating Art. L. 234-1, and regulations R. 234-1 and R. 234-3 of the French Commercial

20  Code and, moreover, failed to supply the requisite related information to the AMF (*Autorité des*

21  *Marchés Financiers* – the French Financial Markets Regulator) as required by Ar. L. 621-22, IV

22  and VI of the French Law on Financial Markets (CMF – *Code monétaire et financier*).

23        530.  Art. 1240 of the French Civil Code states: "Any act whatsoever of person which

24  causes damage to others obliges him through whose fault it was caused to remedy it."

25        531.  As a result of these management torts, Defendants Depeyrot, Dupont, MBDA, Van

26  den Bossche, Soitec, and Beriot destroyed (i) Aldini's opportunity to acquire Dolphin Integration

27  and its assets and IP, which Aldini had valued at €649,000,000, (ii) Aldini's 28,466 Dolphin

28  Integration shares, and (iii) Aldini's investment of time and efforts expended on its contemplated

acquisition of Dolphin Integration, and (iv) harmed its reputation, as a result of which Aldini suffered damages.

532.    The resulting damages were proximately caused by these Defendants' torts as alleged in detail in this Complaint.

533.    As a result, pursuant to Arts. 1240 and 1850 of the French Civil Code, and Art. L. 225-251 of the French Commercial Code, Defendants Depeyrot, Dupont, MBDA, Van den Bossche, Soitec, and Beriot are liable directly to Aldini for the damages they caused it, with the exact amount to be determined at trial.

534.    Defendants' conduct was knowing, willful, intentional or deliberate wrongdoing, malicious, oppressive, and reprehensible and carried out with an evil motive, or a conscious act that willfully and wantonly disregarded Aldini's rights, intended to cause and that, in fact, did cause Aldini to suffer harm.  As a result, Aldini is entitled to punitive damages in an amount to be determined at trial appropriate to deter further such conduct.

WHEREFORE, Plaintiff prays for judgment as follows:

1.    As to the First Cause of Action (Intentional Interference with a Prospective Economic Advantage),

    a.    Actual damages of no less than €598,000,000 (approximately $703,000,000) with the specific amount to be determined at trial, plus any prejudgment interest owed thereon;

    b.    Punitive damages in an amount to be determined at trial against all Defendants with the exception of Defendants the Republic of France and Ministère des Armées;

    c.    Costs of suit; and

    d.    Such other and further relief as the Court may deem appropriate.

2.    As to the Second Cause of Action (Taking and Expropriation in Violation of International Law),

    a.    Actual damages of no less than €598,000,000 (approximately $703,000,000) with the specific amount to be determined at trial, plus any prejudgment

interest owed thereon;

 b.  Punitive damages in an amount to be determined at trial against Defendants DGA and Kammerer;

 c.  Costs of suit; and

 d.  Such other and further relief as the Court may deem appropriate.

3.  As to the Third Cause of Action (Aiding & Abetting Expropriation in Violation of International Law),

 a.  Actual damages of no less than €598,000,000 (approximately $703,000,000) with the specific amount to be determined at trial, plus any prejudgment interest owed thereon;

 b.  Punitive damages in an amount to be determined at trial;

 c.  Costs of suit; and

 d.  Such other and further relief as the Court may deem appropriate.

4.  As to the Fourth Cause of Action (Tort Pursuant to California Civil Code §1708 And §1714),

 a.  Actual damages of no less than €598,000,000 (approximately $703,000,000) with the specific amount to be determined at trial, plus any prejudgment interest owed thereon;

 b.  Special damages in an amount to be determined at trial;

 c.  Consequential damages in an amount to be determined at trial;

 d.  Punitive damages in an amount to be determined at trial;

 e.  Costs of suit; and

 f.  Such other and further relief as the Court may deem appropriate.

5.  As to the Fifth Cause of Action (Violation of The Defend Trade Secrets Act),

 a.  Actual damages of no less than €598,000,000 (approximately $703,000,000) with the specific amount to be determined at trial, plus any prejudgment interest owed thereon;

 b.  Special damages in an amount to be determined at trial;

1       c. Consequential damages in an amount to be determined at trial;

2       d. Punitive damages in an amount to be determined at trial;

3       e. Costs of suit; and

4       f. Such other and further relief as the Court may deem appropriate.

5      6. As to the Sixth Cause of Action, (Aiding and Abetting Violation of The Defend

6       Trade Secrets Act),

7       a. Actual damages of no less than €598,000,000 (approximately $703,000,000)

8        with the specific amount to be determined at trial, plus any prejudgment

9        interest owed thereon;

10      b. Special damages in an amount to be determined at trial;

11      c. Consequential damages in an amount to be determined at trial;

12      d. Punitive damages in an amount to be determined at trial except against

13       Defendants the Republic of France and Ministère des Armées;

14      e. Costs of suit; and

15      f. Such other and further relief as the Court may deem appropriate.

16    7. As to the Seventh Cause of Action (Violation of French Trade Secret Law),

17      a. Actual damages of no less than €598,000,000 (approximately $703,000,000)

18       with the specific amount to be determined at trial, plus any prejudgment

19       interest owed thereon;

20      b. Special damages in an amount to be determined at trial;

21      c. Consequential damages in an amount to be determined at trial;

22      d. Punitive damages in an amount to be determined at trial;

23      e. Costs of suit; and

24      f. Such other and further relief as the Court may deem appropriate.

25    8. As to the Eighth Cause of Action (Aiding and Abetting Violation of French Trade

26      Secret Law – Defendants the Republic of France, Ministère des Armées, DGA,

27      Kammerer, Bouvier, Berger, Sommelet, Boudre),

28      a. Actual damages of no less than €598,000,000 (approximately $703,000,000)

1    with the specific amount to be determined at trial, plus any prejudgment

2    interest owed thereon;

3    b.  Special damages in an amount to be determined at trial;

4    c.  Consequential damages in an amount to be determined at trial;

5    d.  Punitive damages in an amount to be determined at trial except against

6    Defendants the Republic of France and Ministère des Armées;

7    e.  Costs of suit; and

8    f.  Such other and further relief as the Court may deem appropriate.

9    9.  As to the Ninth Cause of Action (Aiding and Abetting Violation of French Trade

10   Secret Law – Defendants Soitec USA, Silvaco, Pesic, Taheri),

11   a.  Actual damages of no less than €598,000,000 (approximately $703,000,000)

12   with the specific amount to be determined at trial, plus any prejudgment

13   interest owed thereon;

14   b.  Special damages in an amount to be determined at trial;

15   c.  Consequential damages in an amount to be determined at trial;

16   d.  Punitive damages in an amount to be determined at trial;

17   e.  Costs of suit; and

18   f.  Such other and further relief as the Court may deem appropriate.

19   10.  As to the Tenth Cause of Action (Management Torts),

20   a.  Actual damages of no less than €598,000,000 (approximately $703,000,000)

21   with the specific amount to be determined at trial, plus any prejudgment

22   interest owed thereon;

23   b.  Special damages in an amount to be determined at trial;

24   c.  Consequential damages in an amount to be determined at trial;

25   d.  Punitive damages in an amount to be determined at trial;

26   e.  Costs of suit; and

27   f.  Such other and further relief as the Court may deem appropriate.

28

COMPLAINT FOR DAMAGES

DATED: August 19, 2021            CONNON WOOD LLP

By: _____ /s/ _____
                          NICHOLAS P.CONNON

Attorneys for Aldini AG
Connon Wood LLP
35 East Union Street, Suite C
Pasadena, CA 91103
Phone: (626) 638-1750
E-mail: nconnon@connonwood.com
E-mail: rdeby@connonwood.com

COMPLAINT FOR DAMAGES

1

2

### DEMAND FOR JURY TRIAL

3      Pursuant to Fed.R.Civ.P. 38(b) and 81(c), Plaintiff Aldini AG, hereby demands a jury trial

4   in the above-captioned matter.

5

6   DATED: August 19, 2021              CONNON WOOD LLP

7                                       By:    _____/s/_____
                                               NICHOLAS P. CONNON

8

9                                       Attorneys for Aldini AG
                                        Connon Wood LLP

10                                      35 East Union Street, Suite C
                                        Pasadena, CA 91103

11                                      Phone: (626) 638-1750
                                        E-mail: nconnon@connonwood.com

12                                      E-mail: rdeby@connonwood.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES

1

## <u>VERIFICATION</u>

2

3       DANIEL BAUMSLAG, Head of Debt & Equity Markets at Aldini AG, hereby affirms

4   that he has read the foregoing Complaint and knows the facts stated in the same to be true of his

5   own personal knowledge and belief, except as to those matters stated on information and belief,

6   and as to those matters, he believes them to be true.

7       In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of

8   the United States of America that the foregoing is true and correct.

9   Executed on:   Zürich, Switzerland
                   August 19, 2021
10

11                                          _____

12                                              DANIEL BAUMSLAG

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28